

**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

### Court of Common Pleas

**New Case Electronically Filed:**
**January 20, 2016 10:40**

By: BRIAN J. GREEN 0063921

Confirmation Nbr. 647306

MAXUS CAPITAL GROUP LLC

vs.

SUPREME MANUFACTURING, INC., ET AL

CV 16 857603

Judge:

JOSEPH D. RUSSO

Pages Filed:  46

EXHIBIT "L"

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| MAXUS CAPITAL GROUP, LLC, | ) | CASE NO. |
| 31300 Bainbridge Road | ) | |
| Cleveland, Ohio 44139 | ) | JUDGE |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | COMPLAINT FOR |
| | ) | MONEY DAMAGES |
| | ) | AND REPLEVIN |
| SUPREME MANUFACTURING, INC., | ) | |
| 327 Billy Boyd Road | ) | |
| Stoneboro, Pennsylvania 16152 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| NEIL E. HOOBLER, | ) | |
| 231 Steckler Road | ) | |
| Stoneboro, Pennsylvania 16152 | ) | |
| | ) | |
| Defendants. | ) | |

Now comes the plaintiff, Maxus Capital Group, LLC ("Plaintiff"), for its Complaint

against the defendants, Supreme Manufacturing, Inc. ("Supreme") and Neil E. Hoobler

("Hoobler") (jointly, "Defendants"), and states as follows:

## OPERATIVE FACTS AND JURISDICTIONAL STATEMENT

1.      This action is brought against Defendants for money damages and replevin.

2.      Upon information and belief, Supreme is a Pennsylvania for profit corporation

having its principal place of business at 327 Billy Boyd Road, Stoneboro,

Pennsylvania 16153.

3.      Upon information and belief, Hoobler is an individual having an address at 231

Steckler Road, Stoneboro, Pennsylvania 16153.

4.      Plaintiff is a Delaware limited liability company licensed to conduct business in the State of Ohio with its principal place of business at 31300 Bainbridge Road, Cleveland, Ohio 44139.

5.      At all times relevant to this Complaint, jurisdiction and venue are proper in Cuyahoga County, Ohio.

6.      On or about September 2, 2014, Supreme entered into Master Lease Agreement No. 1425 with Plaintiff (the "Lease Agreement"). (A copy of the Lease Agreement is attached as Exhibit "A.")

7.      On or about September 2, 2014, Hoobler executed a Personal Guaranty of the Lease Agreement (the "Guaranty"). (A copy of the Guaranty is attached as Exhibit "B.")

8.      On or about September 2, 2014, Supreme executed Schedule No. 001 to the Lease Agreement ("Schedule 001"), relating to certain equipment as set forth on the exhibit to Schedule 001 (the "Schedule 001 Equipment"). (A copy of Schedule 001 with related exhibits is attached as Exhibit "C.")

9.      On or about March 17, 2015, Supreme executed Schedule No. 002 to the Lease Agreement ("Schedule 002"), relating to certain equipment as set forth on the exhibit to Schedule 002 (the "Schedule 002 Equipment"). (A copy of Schedule 002 with related exhibits is attached as Exhibit "D.")

10.     All Defendants have defaulted under the terms of the Lease Agreement and Personal Guaranty entitling Plaintiff to money damages and replevin.

2

## COUNT I
### (Breach of Contract- Schedule 001)

11.  Plaintiff incorporates by reference each of the allegations contained in Paragraphs 1 through 10 above, as though fully set forth herein.

12.  The Lease Agreement, the Guaranty, and Schedule 001 constitute contractual documents between Plaintiff and Defendants.

13.  Pursuant to the terms of the Lease Agreement, the Guaranty, and Schedule 001, Defendants are obligated to maintain certain financial covenants and provide certain financial information documentation as set forth in Paragraph 9 of Schedule 001.

14.  Defendants have failed to perform in accordance with the terms of the Lease Agreement, the Guaranty, and Schedule 001, including, but not limited to, maintaining the required financial covenants, providing required financial information, in breach of their contractual duties to Plaintiff. Additionally, upon information and belief, Defendants have move some of the Schedule 001 Equipment out-of-state to California, without the prior written consent of Plaintiff, in direct violation of the Lease Agreement and Guaranty.

15.  Pursuant to the terms of the Lease Agreement, the Guaranty, and Schedule 001, as a direct and proximate result of Defendants' breach of contract, Plaintiff is entitled to receive the Stipulated Loss Value of the Schedule 001 Equipment.

3

16.     As a direct and proximate result of Defendants' breach of contract, as of January 15, 2016, Plaintiff is entitled to recover from Defendants, the Stipulated Loss Value amount of $139,350.00.

## COUNT II
### (Unjust Enrichment- Schedule 001)

17.     Plaintiff incorporates by reference each of the allegations contained in Paragraphs 1 through 16 above, as though fully set forth herein.

18.     As a direct and proximate result of Defendants' failure to comply the terms of the Lease Agreement, Guaranty, and Schedule 001, Defendants have been unjustly enriched.

19.     As a direct and proximate result of Defendants' unjust enrichment, as of January 15, 2016, Plaintiff is entitled to damages in the amount of $139,350.00.

## COUNT III
### (Replevin- Schedule 001)

20.     Plaintiff incorporates by reference each of the allegations contained in Paragraphs 1 through 19 above, as though fully set forth herein.

21.     As a direct and proximate result of Defendants' failure to comply with the terms of the Lease Agreement, Guaranty, and Schedule 001, Plaintiff is entitled to recovery of the Schedule 001 Equipment.

22.     Defendants are wrongfully depriving Plaintiff of possession of the Schedule 001 Equipment.

4

23.   Plaintiff has demanded payment and has advised Defendants of its intention to take action as an owner and/or secured creditor of Schedule 001 Equipment and the Defendants have denied Plaintiff's demand.

24.   Unless the Schedule 001 Equipment is returned, it will be subject to depletion to the detriment of Plaintiff.

25.   Unless the Defendants immediately return the Schedule 001 Equipment to Plaintiff, Plaintiff will be damaged.

26.   As a direct and proximate result of Defendants' actions as set forth herein, Plaintiff is entitled to replevin of the Schedule 001 Equipment.

<u>COUNT IV</u>
(Breach of Contract- Schedule 002)

27.   Plaintiff incorporates by reference each of the allegations contained in Paragraphs 1 through 26 above, as though fully set forth herein.

28.   The Lease Agreement, the Guaranty, and Schedule 002 constitute contractual documents between Plaintiff and Defendants.

29.   Pursuant to the terms of the Lease Agreement, the Guaranty, and Schedule 002 Defendants are obligated to maintain certain financial covenants and provide certain financial information documentation as set forth in Paragraphs 9 and 10 of Schedule 002.  Additionally, Defendants are obligated to make all payments to Plaintiff pursuant to the Lease Agreement, the Guaranty, and Schedule 002.

5

30. Defendants have failed to perform in accordance with the terms of the Lease Agreement, the Guaranty, and Schedule 002 by, including, but not limited to, failing to make required payments, failing to maintain the required financial covenants, and failing to provide required financial information in breach of their contractual duties to Plaintiff. Additionally, upon information and belief, Defendants have modified the Schedule 002 Equipment without the prior written consent of Plaintiff in direct violation of the Lease Agreement and the Guaranty.

31. Pursuant to the terms of the Lease Agreement, the Guaranty, and Schedule 002, as a direct and proximate result of Defendants' breach of contract, Plaintiff is entitled to receive the Stipulated Loss Value of the Schedule 002 Equipment.

32. As a direct and proximate result of Defendants' breach of contract, as of November 16, 2015, Plaintiff is entitled to recover from Defendants, the Stipulated Loss Value amount of $8,336,567.36.

## COUNT V
### (Unjust Enrichment- Schedule 002)

33. Plaintiff incorporates by reference each of the allegations contained in Paragraphs 1 through 32 above, as though fully set forth herein.

34. As a direct and proximate result of Defendants' failure to comply the terms of the Lease Agreement, Guaranty, and Schedule 002, Defendants have been unjustly enriched.

6

35.     As a direct and proximate result of Defendants' unjust enrichment, as of
        November 16, 2015, Plaintiff is entitled to damages in the amount of
        $8,336,567.36.

## COUNT VI
### (Replevin- Schedule 002)

36.     Plaintiff incorporates by reference each of the allegations contained in Paragraphs
        1 through 35 above, as though fully set forth herein.

37.     As a direct and proximate result of Defendants' failure to comply with the terms
        of the Lease Agreement, Guaranty, and Schedule 002, Plaintiff is entitled to
        recovery of the Schedule 002 Equipment.

38.     Defendants are wrongfully depriving Plaintiff of possession of the Schedule 002
        Equipment.

39.     Plaintiff has demanded payment and has advised Defendants of its intention to
        take action as an owner and/or secured creditor of Schedule 002 Equipment and
        the Defendants have denied Plaintiff's demand.

40.     Unless the Schedule 002 Equipment is returned, it will be subject to depletion to
        the detriment of Plaintiff.

41.     Unless the Defendants immediately return the Schedule 002 Equipment to
        Plaintiff, Plaintiff will be damaged.

42.     As a direct and proximate result of Defendants' actions as set forth herein,
        Plaintiff is entitled to replevin of the Schedule 002 Equipment.

7

WHEREFORE, Plaintiff requests the following relief:

    A.  On Counts I and II for damages as of January 15, 2016 in the amount of $139,350.00, plus interest, against Defendants jointly and severally.

    B.  On Count III, replevin of the Schedule 001 Equipment;

    C.  On Counts IV and V for damages as of November 16, 2015, in the amount $8,336,567.36, plus interest, against Defendants jointly and severally;

    D.  On Counts VI, for replevin of the Schedule 002 Equipment; and

    E.  For attorneys' fees, costs, and for such other relief as this Court deems just and proper.

Respectfully submitted,

/s/    *Brian Green*

BRIAN GREEN (0063921)
bgreen@shaperolaw.com
JAMES MARX (003899)
jmarx@shaperolaw.com
SHAPERO & GREEN LLC
Signature Square II, Suite 220
25101 Chagrin Boulevard
Beachwood, Ohio  44122
P:  (216) 831-5100
*Attorneys for Plaintiff*

P:\Brian\Maxus Capital\Supreme\Complaint

8



# MAXUS
## CAPITAL GROUP

**Master Agreement No. 1425**

**MASTER AGREEMENT OF TERMS AND CONDITIONS FOR LEASE** ("Master Agreement") made as of September 2, 2014 between Maxus Capital Group, LLC, a Delaware limited liability company, having its chief executive offices at 31300 Bainbridge Road, Cleveland, Ohio 44139 ("Lessor") and Supreme Manufacturing, Inc., a Pennsylvania corporation, having its executive offices at 327 Billy Boyd Road, Stoneboro, PA 16153 ("Lessee").

**1. LEASE**

On the terms and conditions of this Master Agreement of Terms and Conditions for Lease ("Master Agreement"), Lessor shall lease to Lessee, and Lessee shall hire from Lessor, the items of personal property (collectively the "Equipment," and individually an "Item") described in the Schedule(s) which shall incorporate this Master Agreement (each, a "Schedule"). Each Schedule shall constitute a separate and independent lease and contractual obligation of Lessee. The term "Lease" shall refer to an individual Schedule which incorporates this Master Agreement. In the event of a conflict between this Master Agreement and any Schedule, the language of the Schedule shall prevail. The Lease shall be effective upon execution by Lessor at its offices.

**2. TERM**

(a) The term of the Lease shall be comprised of a Delivery Term, Installation Term, Base Term, and any applicable Renewal Term, Extension Term, or Holdover Term. The Delivery Term for each Item shall commence on the date the Item is delivered to Lessee and shall end on the Installation Date. The Installation Term shall commence on the Installation Date and terminate on the last day of the month following the Installation Date for the last Item to be installed (the "Base Term Commencement Date"). The Base Term of the Lease shall begin on the Base Term Commencement Date, and shall, subject to Subsection 2(b), terminate on the last day of the last month of the Base Term. The date of installation (the "Installation Date") for any Item shall be the earlier of either (i) the date on which the entity responsible for installing such Item certifies that the Item is installed and placed in good working order, or (ii) if Lessee has caused a delay in the installation of an Item, no later than seven days from the date the Item is delivered to the Equipment Location specified in the Schedule, or (iii) if Lessee is to install the Item, the third day after delivery. In the event the Equipment is already installed at the Equipment Location of Lessee, there shall be no Delivery Term and the Installation Date shall be the date on which Lessor pays for the Equipment. Upon Lessor's request, Lessee shall execute and deliver to Lessor an Installation Certificate, confirming, among other matters, the Installation Date. The Renewal Term shall be any contractually agreed upon term beyond the Base Term or any preceding Renewal Term, and shall commence on the day next following the last day of the Base Term or Renewal Term, as applicable.

(b) A Lease may be terminated as of the last day of the last month of the Base Term, any Renewal Term or any Extension Term, as the case may be (such date, the "End of Term"), by written notice given by either Lessor or Lessee not less than six (6) nor more than nine (9) months prior to the End of Term. If the Lease is not so terminated at the End of Term, the term of the Lease shall be automatically extended for successive six (6) month periods (each such period, an "Extension Term") until such six (6) month prior written notice is given. No notice of termination may be revoked without the written consent of the other party.

**3. RENTAL**

(a) The rental amount payable to Lessor by Lessee for the Equipment will be as set forth on the Schedule. As rent for Equipment, Lessee shall pay Lessor (i) in immediately available funds (by such method or means as Lessor shall, from time to time) and in advance on the Base Term Commencement Date and on the first day of each subsequent month during the Base Term of the Lease the Base Monthly Rental, per month, (or during any Renewal Term the amount of the rent agreed to by the parties, or during any Extension Term, the amount of rent payable as of the end of the preceding Base Term or Renewal Term, or at the Holdover Rate, as applicable) (all rental due during the term of the Lease, collectively the "Rent") and (ii) on the Installation Date (and monthly thereafter until the Base Term Commencement Date occurs) an amount equal to 1/30th of the Base Monthly Rental for each Item times the number of days which will elapse from the earlier of any payment made by Lessor or the Installation Date of such Item to the first day of the following month. Each remittance from Lessee to Lessor shall contain information as to the Lease for which payment is made. If Lessor makes any progress or similar payment in respect of any Equipment, such payment shall be treated as an "Item" under the Lease, having an Installation Date of the date of such payment, and rent shall be payable with respect thereto as provided in this Subsection 3(a). If Lessor determines in its reasonable judgment that the Lease

will not commence for any reason, then Lessee will, within ten (10) days after request by Lessor, repay to Lessor the amount of each such progress payment and all Installation Term rent shall be retained by Lessor.

(b) For any payment of rent or other amount due under a Lease which is past due for more than three (3) days, interest shall accrue at the rate of 2% per month, from the date such payment was due until payment is received by Lessor, and for any period during which Lessee is in default hereunder, interest shall accrue at the rate of 5% per month, or if such rate shall exceed the maximum rate of interest allowed by law, then at such maximum rate. In addition to the above interest, Lessee shall pay Lessor a negotiated flat administrative fee equal to $75 for each such overdue payment in order to reimburse Lessor for its costs and expenses associated with such overdue payment and not as a penalty.

**4. TAXES**

The term "Taxes" shall mean all taxes, fees and assessments due, assessed or levied by any foreign, federal, state or local government or taxing authority, and/or any penalties, fines or interest, which are imposed against or on the Equipment, its use, operation, or ownership, or the rentals or receipts due under the Lease, or penalties arising from the failure to file a return with respect to the Taxes, but shall not include any federal or state taxes based upon or measured by the net income of Lessor, except any such Tax that is imposed in lieu of sales or use tax. As of the commencement of the term of the Lease, Lessee shall promptly report, file, and pay, and indemnify, and hold Lessor harmless with respect to any and all Taxes. Lessee will, upon request by Lessor, submit to Lessor written evidence of Lessee's payment of all Taxes, the basis for its calculation thereof, and copies of any returns filed. Lessee shall also pay to Lessor upon demand (on or before the End of Term, if so requested) Lessor's good faith estimate of any Taxes allocable to the Lease, but not yet due and payable as of the End of Term (including without limitation personal property taxes). Lessee and Lessor shall thereafter settle the amount due to be paid by Lessee or refunded by Lessor based on the actual Tax paid.

**5. NET LEASE**

The Lease is a net lease, it being the intention of the parties that all costs, expenses and liabilities associated with the Equipment or its lease shall be borne by Lessee. Lessee's agreement to pay all obligations under the Lease, including but not limited to Rent, is absolute and unconditional and such agreement is for the benefit of Lessor and its Assignee(s), as such term is defined in Section 11(a). Lessee's obligations shall not be subject to any abatement, deferment, reduction, setoff, defense, counterclaim or recoupment for any reason whatsoever. Except as may be otherwise expressly provided in the Lease, it shall not terminate, nor shall the obligations of Lessee be affected by reason of any defect in or damage to, or any loss or destruction of, or obsolescence of, the Equipment or any Item from any cause whatsoever, or the interference with the use by any private person, corporation or governmental authority, or as a result of any war, riot, insurrection or Act of God. It is the express intention of Lessor and Lessee that all Rent and other sums payable by Lessee under the Lease shall be, and continue to be, payable in all events throughout the term of the Lease. The Lease shall be binding upon Lessee, its successors and permitted assigns and shall inure to the benefit of Lessor and its Assignee(s).

**6. FINANCE LEASE STATUS**

The parties agree, and Lessee represents for the benefit of Lessor and its Assignee(s), that this Lease is a "Finance Lease" as defined by the Uniform Commercial Code (as currently set forth in Title XIII of the Ohio Revised Code, as the same may hereafter be amended, the "UCC") and not a lease intended as security. Lessee acknowledges that either (a) Lessee has reviewed and approved any written Supply Contract (as defined in the UCC) covering the Equipment purchased from the "Supplier" (as defined in the UCC) thereof for lease to Lessee; or (b) Lessor has informed or advised Lessee, in writing, either previously or by this Lease of the following: (i) the identity of the Supplier; (ii) that Lessee may have rights under the Supply Contract; and (iii) that Lessee may contact the Supplier for a description of any such rights Lessee may have under the Supply Contract.

**7. INSTALLATION, RETURN AND USE OF EQUIPMENT**



PLAINTIFF'S EXHIBIT

(a)  Upon delivery of the Equipment to Lessee, Lessee shall pay as transportation, installation, rigging, packing and insurance charges with respect to the Equipment, in the case of a sale and leaseback transaction, Lessee shall, upon the request of Lessor, certify the date the Equipment was first put into use. Lessee will provide the required electric current and a suitable place of installation for the Equipment with all appropriate facilities as specified by the manufacturer. No cards, tapes, disks, data cells or other input/output and storage media may be used by Lessee to operate any item unless it meets the specifications of the manufacturer. Lessee agrees that it will not install, or permit the installation of, the Equipment without Lessor's consent.

(b)  Lessee will at all times keep the Equipment in its sole possession and control. The Equipment shall not be moved from the Equipment Location stated in the Schedule without the prior written consent of Lessor and in no event shall the Equipment be moved outside the continental, contiguous United States.  Lessee will comply with all laws, regulations, and ordinances, and all applicable requirements of the manufacturer of the Equipment which apply to the physical possession, use, operation, condition and maintenance of the Equipment.  Lessee agrees to obtain all permits and licenses necessary for the operation of the Equipment.

(c)  Lessee shall not without the prior written consent of Lessor affix or install any accessory, feature, equipment or device to the Equipment or make any improvement, upgrade, modification, alteration or addition to the Equipment (any such accessory, feature, equipment, device or improvement, upgrade, modification, alteration or addition affixed or installed, an "Improvement"). This to all improvements shall, without further act, upon the making, affixing or installation of such improvement, vest solely in Lessor, except such Improvements as may be readily removed without causing material damage to the Equipment and without in any way affecting or impairing the originally intended function, value or use of the Equipment (a "Severable Improvement"). Provided the Equipment is returned to Lessor in the condition required by the Lease, including, but not limited to coverage under the manufacturer's standard maintenance contract, title to any Severable Improvement shall vest in Lessee upon removal. Any Severable Improvement not removed from the Equipment prior to return shall at Lessor's option remain the property of Lessor and shall be certified for maintenance by the manufacturer, at Lessor's expense. Lessee shall notify Lessor in writing no less than sixty (60) days prior to the desired installation date of the type of improvement Lessee desires to obtain. Lessor may, at any time within ten (10) days after receipt of the notice, offer to provide the improvement to Lessee upon terms and conditions to be mutually agreed upon.  Lessee shall notify Lessor of any third party offers and shall lease the improvement from Lessor if Lessor meets the material terms of the third party offer. If Lessee leases an improvement from Lessor, such lease shall be under a separate Schedule, the improvement shall not be placed in service by Lessee prior to acquisition by Lessor, and Lessee shall execute and deliver any document necessary to vest title to such improvement in Lessor. Lessee shall cause all improvements to be maintained, at Lessee's expense, in accordance with the requirements of Section 8.  Unless otherwise agreed to by Lessor, upon the expiration or earlier termination of the Lease, any improvement shall be de-installed and removed from the Equipment by the manufacturer, at Lessee's expense. If the improvement is removed, the Equipment shall be restored to its unmodified condition and shall be certified for maintenance by the manufacturer, at Lessee's expense. In the event an improvement is provided to Lessee or financed by a party other than Lessor, Lessee shall cause such party to execute and deliver to Lessor such documents as shall be required by Lessor to protect the unidentified and undivided interests of Lessor and any Assignee(s) in the Equipment and the affected Lease.

(d)  Lessee shall at the termination of the Lease for any reason at its expense, de-install, pack and return all, but not less than all, the Equipment to Lessor at such location within the continental United States as shall be designated by Lessor in the same condition and appearance as of the installation date, reasonable wear and tear excepted, and in good operating order and repair, with all current engineering changes prescribed by the manufacturer of the Equipment or a maintenance contractor approved by Lessor (the "Maintenance Organization") incorporated into the Equipment. Upon redelivery to Lessor, Lessee shall arrange and pay for such repairs (if any) as are necessary for the manufacturer of the Equipment or a Maintenance Organization to accept the Equipment under a maintenance contract at its then standard rates.  If the Equipment is not redelivered to Lessor in conformity with all applicable provisions hereof upon the End of Term, then in addition to any other rights and remedies Lessor may otherwise have under the Lease, rental shall be payable by Lessee with respect to such Equipment at a monthly rate determined by Lessor in its reasonable discretion to be the fair market rental that would be payable for the monthly rental of such Equipment in its normal condition, but in no event less than two hundred percent (200%) of the then current Rental (in either case, the "Holdover Rate"). The Holdover Rate shall be communicated in writing by Lessor to Lessee following the scheduled date of redelivery, and shall be payable from such scheduled date through the date of actual redelivery of the Equipment in conformity with all applicable provisions of this Lease; or the date on which the Equipment is brought into conformity with all such provisions, if later.

**8.  MAINTENANCE AND REPAIRS**

Lessee shall, during the term of the Lease, maintain in full force and effect a contract with the manufacturer of the Equipment or a Maintenance Organization covering at least prime shift maintenance of the Equipment. Lessee upon request

shall furnish Lessor with a copy of such maintenance contract as amended or supplemented. During the term of the Lease, Lessee shall, at its expense, keep the Equipment in good working order, repair, appearance and condition and make all necessary adjustments, repairs and replacements, all of which shall become the property of Lessor.  Lessee shall not use or permit the use of the Equipment for any purpose for which, in the opinion of the manufacturer of the Equipment or the Maintenance Organization, the Equipment is not designed or intended.

**9.  OWNERSHIP, LIENS AND INSPECTIONS**

(a)  Lessee shall keep the Equipment free from any marking or labeling which might be interpreted as a claim of ownership by Lessee or any party other than Lessor and its Assignee(s), and shall affix and maintain tags, decals or plates furnished by Lessor on the Equipment indicating ownership and title in the Equipment in Lessor or its Assignee(s).  Upon notice (and during the occurrence and continuance of an Event of Default, with or without notice) to Lessee, Lessor or its agents shall have access to the Equipment and Lessee's books and records with respect to the Lease and the Equipment during regular business hours for the purpose of inspection and for any other purpose contemplated by the Lease, subject to the reasonable security requirements of Lessee.

(b)  Lessee shall execute and deliver such instruments, including UCC financing statements, as may need to be filed to evidence the interest of Lessor and its Assignee(s) in the Equipment and the Lease.  Lessee authorizes Lessor and its Assignee(s) to file UCC financing statements without Lessee's signature to evidence the interest of Lessor and its Assignee(s) in the Equipment and the Lease.  Lessee has no interest in the Equipment except as expressly set forth in the Lease, and that interest is a leasehold interest.  Lessor and Lessee agree, and Lessee represents for the benefit of Lessor and its Assignee(s) that the Lease is intended to be a "true lease" as the term is commonly used under the Internal Revenue Code of 1986, as amended (the "Code").  In the event that a Lease is deemed to be a lease intended as security or is otherwise deemed to be a secured loan, conditional sale, and/or not a Finance Lease or "true lease" (any of the foregoing, a "Conditional Sale"), then Lessor shall be deemed to have granted Lessor a first priority security interest in the Equipment related to such Lease to secure all of Lessee's obligations to Lessor under such Lease and such security interest shall be perfected by the filing of such UCC financing statement(s).

(c)  LESSEE SHALL KEEP THE LEASE, THE EQUIPMENT AND ANY IMPROVEMENTS FREE AND CLEAR OF ALL LIENS AND ENCUMBRANCES OF WHATSOEVER KIND (EXCEPT THOSE CREATED BY LESSOR) AND LESSEE SHALL NOT ASSIGN THE LEASE OR ANY OF ITS RIGHTS UNDER THE LEASE OR SUBLEASE ANY OF THE EQUIPMENT OR GRANT ANY RIGHTS TO THE EQUIPMENT WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR.  No permitted assignment or sublease shall relieve Lessee of any of its obligations under the Lease and Lessee agrees to pay all costs and expenses Lessor may incur in connection with such sublease or assignment.  Lessee grants to Lessor the right of first refusal on any permitted sublease or other permitted grant of Lessee's rights to the Equipment.

**10.  DISCLAIMER OF WARRANTIES**

(a)  LESSOR LEASES THE EQUIPMENT "AS IS", AND BEING NEITHER THE MANUFACTURER OF THE EQUIPMENT NOR THE AGENT OF EITHER THE MANUFACTURER OR THE SUPPLIER, LESSOR DISCLAIMS ANY REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, WITH RESPECT TO THE CONDITION OR PERFORMANCE OF THE EQUIPMENT, ITS MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR WITH RESPECT TO PATENT INFRINGEMENTS OR THE LIKE. LESSOR SHALL HAVE NO LIABILITY TO LESSEE FOR ANY CLAIM, LOSS OR DAMAGE OF ANY KIND OR NATURE WHATSOEVER, NOR SHALL THERE BE ANY ABATEMENT OF RENTAL FOR ANY REASON INCLUDING CLAIMS ARISING OUT OF OR IN CONNECTION WITH (I) THE DEFICIENCY OR INADEQUACY OF THE EQUIPMENT FOR ANY PURPOSE, WHETHER OR NOT KNOWN OR DISCLOSED TO LESSOR, (II) ANY DEFICIENCY OR DEFECT IN THE EQUIPMENT, (III) THE USE OR PERFORMANCE OF THE EQUIPMENT, OR (IV) ANY LOSS OF BUSINESS OR OTHER CONSEQUENTIAL LOSS OR DAMAGE, WHETHER OR NOT RESULTING FROM ANY OF THE FOREGOING AND WHETHER OR NOT FORESEEABLE.

(b)  For the term of the Lease, Lessor assigns to Lessee (to the extent possible), and Lessee may have the benefit of, any and all manufacturer's warranties, service agreements and patent indemnities, if any, with respect to the Equipment; provided, however, that Lessee's sole remedy for the breach of any such warranty, indemnification or service agreement shall be against the manufacturer of the Equipment and not against Lessor, nor shall any such breach have any effect whatsoever on the rights and obligations of Lessor or Lessee with respect to the Lease.

**11.  ASSIGNMENT BY LESSOR**

(a)  Lessee acknowledges and understands that Lessor may assign to a successor, financing lender and/or purchaser (the "Assignee"), all or any part of Lessor's right, title and interest in and to the Lease and the Equipment and Lessee hereby consents to such assignment(s).  In the event Lessor transfers or assigns, or retransfers or reassigns, to an Assignee all or part of Lessor's interest in the Lease, the Equipment or any sums payable under the Lease, whether as collateral security for loans or advances made or to be made to Lessor by such Assignee or otherwise, Lessee covenants that, upon receipt of notice of any such transfer or assignment and instructions from Lessor, (i) Lessee shall, if so instructed, pay and perform its obligations under the Lease to Assignee (or to any other party designated by Assignee), and shall not assign the Lease or any of its rights under the Lease or permit the Lease to be amended, modified, or terminated without the prior written consent of Assignee; and (ii) Lessee's obligations under the Lease with respect to Assignee shall be absolute and unconditional and not be subject to any abatement, reduction, recoupment, defense, offset or counterclaim for any reason, alleged or proven, including, but not limited to, defect in the Equipment, the condition, design, operation or fitness for use of the Equipment or any loss or destruction or obsolescence of the Equipment or any part thereof, the prohibition of or other restrictions against Lessee's use of the Equipment, the interference with such use by any person or entity, any failure by Lessor to perform any of its obligations contained in the Lease, any insolvency or bankruptcy of Lessor, or for any other cause, and, (iii) Lessee shall, upon request of Lessor, submit documents and certificates as may be reasonably required by Assignee to secure and complete such transfer or assignment, including but not limited to the documents set forth in Section 16(c) of this Master Agreement, (iv) Lessee shall deliver to Assignee copies of any notices which are required under the Lease to be sent to Lessor, and (v) Lessee shall, if requested, restate to Assignee the representations, warranties and covenants contained in the Lease (upon which Lessee acknowledges Assignee may rely) and shall make such other representations, warranties and covenants to Assignee as may be reasonably required to give effect to the assignment.

(b)  By accepting any assignment or transfer of the Lease or any interest therein, each Assignee shall be deemed to have agreed that, so long as Lessee is not in default under the Lease, such Assignee shall take no action to interfere with Lessee's quiet enjoyment and use of the Equipment in accordance with the terms of the Lease.  No such assignment or conveyance shall relieve Lessor of its express obligations, nor increase Lessee's obligations, under the Lease and Lessee agrees it shall not look to any Assignee to perform any of Lessor's obligations under the Lease.  Lessee warrants that it will not enter into negotiations for future loans or financing transactions with an Assignee without prior written consent of Lessor.

**12.  QUIET ENJOYMENT**

Lessor covenants that so long as Lessee is not in default under the Lease, Lessor shall take no action to interfere with Lessee's possession and use of the Equipment subject to and in accordance with the provisions of the Lease.

**13.  INDEMNIFICATION**

Except to the extent arising from the gross negligence or willful misconduct of Lessor or Assignee, Lessee shall and does agree to indemnify, defend, protect, save and keep harmless Lessor and its Assignee(s) from and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, suits, costs, or expenses (including legal fees and expenses) of any kind and nature whatsoever which may be imposed upon, incurred by or asserted against Lessor or its Assignee(s) in any way relating to or arising out of the Lease, the manufacture, ownership, lease, possession, use, condition, or operation of the Equipment (including, without limitation, those claims based on latent and other defects, whether or not discoverable, or claims based on strict liability, or any claim for patent, trademark or copyright infringement) or any misrepresentation by Lessee in the Lease or any related document or Lessee's breach thereof.  Lessor's and the Assignee's rights arising from this Section shall survive the expiration or other termination of the Lease.  Nothing in this Section shall limit or waive any right of Lessee to proceed against the manufacturer of the Equipment.

**14.  RISK OF LOSS**

(a)  Lessee assumes and shall bear the entire risk of loss and damage, whether or not insured against, of every item from any and every cause whatsoever as of the date the Equipment is delivered to Lessee.

(b)  In the event of loss or damage of any kind to any item, Lessee shall use all reasonable efforts to place the item in good repair, condition and working order to the reasonable satisfaction of Lessor within sixty (60) days of such loss or damage, unless the manufacturer of the Equipment or a Maintenance Organization determines that such item has been irreparably damaged, in which case Lessee shall, within ten (10) days of such determination of irreparable loss, make its election to either pay Lessor the Stipulated Loss Value (as set forth in Attachment A to this Master Agreement) for the irreparably damaged item or replace the irreparably damaged item, all as provided in this Section.  To the extent that the item is damaged but not irreparably damaged and if Lessee is entitled, pursuant to the insurance coverage, to obtain proceeds from such insurance for the repair of the item, Lessee (provided no Event of Default has occurred) may arrange for the

disbursement of such proceeds to the manufacturer or other entity approved by Lessor to perform the repairs to pay the cost of repair.  However, Lessee's obligation to timely repair the damaged item is not contingent upon receipt of such insurance proceeds.

(c)  In the event that Lessee elects to pay Lessor the Stipulated Loss Value for the irreparably damaged item, Lessee shall (i) pay such amount (computed as of the first day of the month following the determination of the irreparable damage) to Lessor on the first day of the month following the election by Lessee as provided in (b) above, (ii) pay all Base Monthly Rental for the item up to the date as of which the Stipulated Loss Value is paid to Lessor, and (iii) arrange with the applicable insurance company (with the consent of Lessor) for the disposition of the irreparably damaged item.  If not all the Equipment is irreparably damaged, the Value for Calculation of Stipulated Loss Value ("Value") as set forth on the Schedule for the irreparably damaged item shall be multiplied by the applicable percentage set forth in Attachment A to compute the Stipulated Loss Value for such irreparably damaged item, and the Base Monthly Rental for the undamaged Equipment remaining due (after payment of the Stipulated Loss Value for the irreparably damaged item) shall be that amount resulting from multiplying the original Base Monthly Rental by the ratio of the Value of the undamaged Equipment divided by the Value for all the Equipment prior to the damage.

(d)  If Lessee elects to replace the irreparably damaged item, Lessee shall continue all payments under the Lease without interruption, as if no such damage, loss or destruction had occurred, and shall replace such irreparably damaged item, paying all costs associated with the replacement, and Lessee shall be entitled to insurance proceeds up to the amount expended by Lessee in effecting the replacement.  Lessee shall within twenty (20) days following the date of determination of irreparable damage, effect the replacement by replacing the irreparably damaged item with a "Replacement Item" as that Lessor has good, marketable and unencumbered title to such Replacement Item.  The Replacement Item shall have a fair market value equal to or greater than the item replaced prior to such loss, and anticipated to have a fair market value at the expiration of the Base Term equal to the fair market value that the replaced item would have had at the end of the Base Term, and be of the same manufacture, model and type and of at least equal capacity to the item for which the replacement is being made.  Upon delivery, such Replacement item shall become subject to all of the terms and conditions of the Lease.  Lessee shall execute all instruments or documents necessary to effect the foregoing.

(e)  For purposes of this Lease, the term "fair market value" shall mean the price that would be obtained in an arm's-length transaction between an informed and willing buyer-lessee under no compulsion to buy or lease and an informed and willing seller-lessor under no compulsion to sell or lease.  If Lessor and Lessee are unable to agree upon fair market value, such value shall be determined, at Lessee's expense, in accordance with the foregoing definition, by three independent appraisers, one to be appointed by Lessee, one to be appointed by Lessor and the third to be appointed by the first two.

**15.  INSURANCE**

During the Lease, Lessee, at its own expense, shall maintain in regard to the Equipment all risk insurance (in an amount not less than the Stipulated Loss Value as identified on Attachment A) and commercial general liability insurance in amounts and with carriers reasonably satisfactory to Lessor.  Any such insurance shall name Lessor and the Assignee as additional insureds and, as for the all risk insurance, loss payees as their interests may appear.  All such insurance shall provide that it may not be terminated, canceled or altered without at least thirty (30) days prior written notice to Lessor and the Assignee.  Coverage afforded to Lessor shall not be rescinded, impaired, or invalidated by any act or neglect of Lessee.  Lessee agrees to supply to Lessor, upon request, evidence of such insurance.

**16.  REPRESENTATIONS AND WARRANTIES OF LESSEE; FINANCIAL STATEMENTS**

(a)  Lessee represents and warrants to Lessor and the Assignee that (i) the execution, delivery and performance of this Master Agreement and the Lease were duly authorized and that upon execution of this Master Agreement and the Lease by Lessee and Lessor, this Master Agreement and the Lease will be in full force and effect and constitute a valid, legal and binding obligation of Lessee, and enforceable against Lessee in accordance with their respective terms; (ii) the Equipment is accurately described in the Lease and all documents of Lessee relating to the Lease; (iii) Lessee is in good standing in the jurisdiction of its organization and in any jurisdiction in which any of the Equipment is located; (iv) no consent or approval of, giving of notice to, registration with, or taking of any other action in respect of, any state, federal or other government authority or agency is required with respect to the execution, delivery and performance by Lessee of this Master Agreement or the Lease or, if any such approval, notice, registration or action is required, it has been obtained or done prior to Lessee's execution and delivery of this Master Agreement and the Lease; (v) the execution and performance of this Master Agreement and the Lease will not violate any judgment, order, law or regulation applicable to Lessee or any provision of Lessee's Articles or Certificate of Incorporation, Code of Regulations or Bylaws, Operating Agreement or similar governing documents, or result in any breach of, or constitute a default under any material contract or obligation of Lessee, or result in the creation of any lien, charge, security interest or other encumbrance upon any assets of Lessee or upon the Equipment pursuant to any instrument to which Lessee is a party or by which it or its property may be bound; (vi) there are no

actions, suits or proceedings pending, or to the knowledge of Lessee, threatened, before any court or administrative agency, arbitrator or governmental body which will, if determined adversely to Lessee, materially adversely affect its ability to perform its obligations under the Lease or any related agreement to which it is a party; (vii) aside from the Master Lease Agreement and the Lease, there are no additional agreements between Lessee and Lessor relating to the Equipment; (viii) any and all financial statements and other information with respect to Lessee or Lessee's Guarantor (defined below) supplied to Lessor both at the time of delivery to Lessor and at the time of execution of the Lease and any amendment of the Lease, are accurate, true and complete; and (ix) the Lease is a commercial lease, and none of the Equipment is intended or will be used for consumer purposes. The foregoing representations and warranties shall survive the execution and delivery of the Lease and any amendments hereto and shall inure to the benefit of Lessor and its Assignees.

(b)    During the term of the Lease, Lessee will provide Lessor with (i) the annual audited financial statements of Lessee within 120 days after the close of Lessee's fiscal year and (ii) the quarterly financial statements of Lessee within 60 days after the close of each of the first three fiscal quarters. If Lessee is a subsidiary of another company or if there is a guarantor of the Lease (if any, "Lessee's Guarantor"), Lessee will also supply any Lessee's Guarantor's, or any other such company's or individual's financial statement by the dates described above. Lessee's obligation to perform under any Lease is subject to the condition that the financial statements furnished to Lessor by Lessee fairly present the financial condition and results of operations of Lessee and its affiliated companies, if any, and of Lessee's Guarantor as of the date of such financial statements, and that since the date of such statements there have been no changes in the assets, liabilities or condition (financial or otherwise) which, in Lessor's or Assignee's sole discretion, are deemed to be materially adverse. If at any time during the term of the Lease there is a change in the landlord or the mortgagee of any Equipment Location, or if there is a replacement of the lender or secured party under any material credit agreement from which Lessor has received a subordination or lien waiver, then Lessee will notify Lessor of such changes fifteen (15) days prior to such changes coming into effect and will provide to Lessor new subordination or waiver agreements from such parties in form and substance reasonably satisfactory to Lessor. Lessee shall also provide Lessor with such other statements concerning (i) the financial position of Lessee and Lessee's Guarantor, if any, and (ii) the Equipment as Lessor may from time to time request.

(c)    Upon Lessor's request, Lessee shall, with respect to each Lease, deliver to Lessor (i) a certificate of a secretarial officer of Lessee certifying the organizational document, resolution (specific or general) or corporate action authorizing the transactions contemplated in the Lease; (ii) an incumbency certificate certifying that the person signing this Master Agreement, the Lease or any related document holds the office that person purports to hold and has authority to sign on behalf of Lessee; (iii) an opinion of Lessee's counsel with respect to the representations in clauses (i) through (vi) of Section 16[a]; (iv) an agreement with Lessor's Assignee with respect to any assignment as referred to in Section 11; (v) the purchase documents if Lessee has sold or assigned its interest in the Equipment to Lessor; (vi) an insurance certificate evidencing the insurance provided by Lessee pursuant to Section 15; and (vii) an Installation Certificate duly executed by Lessee. Failure by Lessee to deliver any of those documents when due shall allow Lessor, at Lessor's option, to continue the Installation Term for the Lease thus delaying the Base Term Commencement Date, to increase the Base Monthly Rental to recover costs incurred by Lessor as a result of the delay, or to cancel the Lease as provided in Section 17.

(d)    Lessee shall provide to Lessor and Lessor's Assignee at least two (2) weeks prior written notice of any proposed change in Lessee's name, state of organization or form of organization.

(e)    Lessee agrees not to release or terminate any UCC filing made in connection with the Lease or the Equipment.

17.    DEFAULT, REMEDIES

(a)    The following shall be deemed "Events of Default" under the Lease:

(1)    Lessee fails to pay any installment of rent or other charge or amount due under the Lease within the sooner to occur of: (i) five (5) days after such payment is due; and (ii) two (2) days after Lessee receives notice that such payment is overdue; or

(2)    Except as expressly permitted in the Lease, Lessee attempts to remove, sell, encumber, assign or sublease or fails to insure any of the Equipment, or fails to deliver any documents required of Lessee under the Lease; or

(3)    Any representation or warranty made by Lessee or Lessee's Guarantor in the Lease or any guaranty or any document supplied in connection with either (including without limitation any financial statement) is misleading or materially inaccurate when made or delivered, as the case may be; or

(4)    Lessee fails to maintain the insurance required in Section 15 herein above; or

(5)    Lessee's Guarantor is in default of any obligation under the applicable guaranty or repudiates its obligations thereunder; or

(6)    Lessee fails to observe or perform any of the other obligations required to be observed by Lessee under the Lease within thirty (30) days of Lessee's first knowledge of facts that would inform Lessee of such failure (whether or not Lessee is aware of the particular obligation contained herein); or

(7)    Lessee or Lessee's Guarantor (i) ceases doing business as a going concern; (ii) sells all or a material portion of its assets or more than 50% of Lessee's voting control is transferred to another entity or person, is either one or more related transactions (without regard to the amount of time between any two such transactions or the relationship between the transferring entity and the entity to which such interests or assets are transferred); (iii) makes an assignment for the benefit of creditors; (iv) admits in writing its inability to pay its debts as they become due; (v) files a voluntary petition in bankruptcy; (vi) is adjudicated a bankrupt or an insolvent; files a petition seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar arrangement under any present or future statute, law or regulation or files an answer admitting or failing to deny the material allegations of a petition filed against it in any such proceeding; (g) remains in default under any material credit agreement for a period of ten (10) days; (h) in Lessor's reasonable opinion has suffered a material adverse change in the financial condition or business operations; or (i) consents to or acquiesces in the appointment of a trustee, receiver, or liquidator for it or of all or any substantial part of its assets or properties, or if it or its trustee, receiver, liquidator or shareholders shall take any action to effect its dissolution or liquidation; or

(8)    If within thirty (30) days after the commencement of any proceedings against Lessee or Lessee's Guarantor seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation, such proceeding shall not have been dismissed, or if within thirty (30) days after the appointment (with or without Lessee's or Lessee's Guarantor's consent) of any trustee, receiver or liquidator of it or all of or any substantial part of its respective assets and properties, such appointment shall not have been vacated.

(b)    Upon the happening of any Event of Default, Lessor may declare Lessee to be in default. Lessee authorizes Lessor at any time thereafter to enter any premises where the Equipment may be and take possession of the Equipment or render it unusable. If Lessor elects or is required to file a replevin action, Lessee hereby irrevocably waives any bonds and any surety or security relating thereto required by any statute, court rule or otherwise as an incident to such possession, and waives any demand for possession prior to the commencement of any suit or action to recover with respect thereto. Lessee shall, upon such declaration of default, without further demand, immediately pay Lessor an amount which is equal to (i) any unpaid amount due on or before Lessor declared the Lease to be in default, plus (ii) as liquidated damages for loss of a bargain and not as a penalty, an amount equal to the Stipulated Loss Value for the Equipment computed as of the date the last Base Monthly Rental payment was due prior to the date Lessor declared the Lease to be in default, together with interest, as provided herein, plus (iii) all attorney and court costs incurred by Lessor or its Assignee relating to the enforcement of its rights under the Lease. After an Event of Default, at the request of Lessor and to the extent requested by Lessor, Lessee shall immediately comply with the provisions of Section 7(d) and Lessor may sell the Equipment at private or public sale, in bulk or in parcels, with or without notice, without having the Equipment present at the place of sale; or Lessor may lease, otherwise dispose of or keep idle all or part of the Equipment, subject, however, to any obligation allow or in equity to mitigate damages. The proceeds of sale, lease or other disposition, if any, of the Equipment shall be applied (1) to all Lessor's costs, charges and expenses incurred in taking, removing, holding, repairing and selling, leasing or otherwise disposing of the Equipment including attorney fees; then (2) to the extent not previously paid by Lessee, to pay Lessor the Stipulated Loss Value for the Equipment and all other sums owed by Lessee under the Lease, including any unpaid Rent which accrued to the date Lessor declared the Lease to be in default and thereafter then remaining unpaid under the Lease; then (3) to reimburse to Lessee the Stipulated Loss Value previously paid by Lessee as liquidated damages; and (4) any surplus shall be retained by Lessor (or, in the case of a Conditional Sale, any surplus shall be remitted to Lessee). Lessee shall pay Lessor any deficiency in (1) and (2) immediately. The exercise of any of the foregoing remedies by Lessor shall not constitute a cancellation of the Lease unless Lessor so notifies Lessee in writing. Lessor may also proceed by appropriate court action, either at law or in equity, without posting bond, to enforce performance by Lessee of the applicable covenants of the Lease or to recover damages for the breach of the Lease.

(c)    The waiver by Lessor of any breach of any obligation of Lessee shall not be deemed a waiver of any future breach of the same or any other obligation. The subsequent acceptance of rental payments under the Lease by Lessor shall not be deemed a waiver of any such prior existing breach at the time of acceptance of such rental payments. The rights afforded Lessor under Section 17 shall be cumulative and concurrent and shall be in addition to every other right or remedy provided for the Lease or now or later existing in law (including as appropriate all the rights of a secured party or lessor under the UCC) or in equity and Lessor's exercise or attempted exercise of such rights or remedies shall not preclude the simultaneous or later exercise of any or all other rights or remedies.

(d)    In the event Lessee shall fail to perform any of its obligations under the Lease, then Lessor may perform the same, but shall not be obligated to do so, at the cost and expense of Lessee. In any such event, all such costs and expenses shall become immediately due and payable upon Lessor's receipt of an invoice therefor.

18.    LESSOR'S TAX BENEFITS

Unless otherwise provided in the Schedule, Lessee acknowledges that Lessor shall be entitled to claim for federal income tax purposes (i) deductions (hereinafter called "Depreciation Deductions") for Lessor's cost of the Equipment for each of its tax years during the term of the Lease under any method of depreciation or other cost recovery formula permitted by the Code and (ii) interest deductions ("Interest Deductions") permitted by the Code on the aggregate interest paid to any Assignee. Lessee agrees to take no action inconsistent (including the voluntary substitution of Equipment) with the foregoing or which would result in the loss, disallowance, recapture or unavailability to Lessor of Depreciation Deductions or Interest Deductions. Lessee hereby indemnifies Lessor and its Assignee(s) from and against (a) any loss, disallowance, unavailability or recapture of Depreciation Deductions or Interest Deductions resulting from any action or failure to act of Lessee, including replacement of the Equipment, plus (b) all interest, penalties, costs, (including attorney fees), or additions to tax resulting from such loss, disallowance, unavailability or recapture.

19.    SECURITY DEPOSITS

For the purpose of securing all of Lessee's obligations under the Master Agreement and all Schedules, Lessee grants to Lessor a security interest in any security deposit described in any Schedule. Any such security deposit may be commingled by Lessor with other funds without any interest payable to Lessee. Upon an Event of Default by Lessee under the Master Agreement or any Schedule, Lessor may, but shall not be obligated to, apply any such security deposit to any obligation of Lessee under the Master Agreement or any Schedule, in which event Lessee shall promptly restore the amount thereof on demand. Upon compliance by Lessee with all terms of the Master Agreement and each Schedule, and within thirty (30) days of Lessee's demand therefor, Lessor shall, at the end of the term of each Schedule and the proper return to Lessor of the Equipment, return to Lessee the balance of any such security deposit relating to such Schedule. Lessee agrees that, in the event of Lessee's bankruptcy, Lessor shall be entitled to set off and retain any amount of the Security Deposit against any and all amounts due to Lessor from Lessee, whether such amounts are classified "pre-petition" or "post-petition" and whether or not the same are considered priority or unsecured claims.

20.    GENERAL

(a)    THIS LEASE SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF OHIO (THE "STATE"), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE. LESSEE HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES TO SUBMIT TO THE SOLE AND EXCLUSIVE JURISDICTION OF THE STATE AND/OR FEDERAL COURTS IN THE STATE. LESSOR AND LESSEE HEREBY WAIVE THE RIGHT TO TRIAL BY JURY OF ANY MATTERS ARISING OUT OF THIS LEASE OR THE CONDUCT OF THE RELATIONSHIP BETWEEN LESSOR AND LESSEE. EACH OF THE PARTIES ALSO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN ANY COURT IN THE STATE. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(b)    The Lease constitutes the entire and only agreement between Lessee and Lessor with respect to the lease of the Equipment, and the parties have only those rights and have incurred only those obligations as specifically set forth herein. The covenants, conditions, terms and provisions of the Lease may not be waived or modified orally. The Lease may not be amended or discharged except by a subsequent written agreement entered into by duly authorized representatives of Lessor and Lessee.

(c)    All notices, consents or requests desired or required to be given under the Lease shall be in writing and shall be delivered in person or sent by certified mail, return, receipt requested, or by courier service to the address of the other party set

forth in the Introduction of the Master Agreement or to such other address as such party shall have designated by proper notice.

(d)    Each Schedule shall be executed in two counterparts, consecutively numbered. To the extent, if any, that a Schedule constitutes chattel paper (as such term is defined in the UCC) no security interest in the Schedule may be created through the transfer or possession of any counterpart other than Counterpart No.1. The Master Agreement, whether signed or in the form of a photocopy, is Exhibit A to the Schedule and is not chattel paper by itself.

(e)    Section headings are for convenience only and shall not be construed as part of the Lease.

(f)    It is expressly understood that all of the Equipment shall be and remain personal property, notwithstanding the manner in which the same may be attached or affixed to realty, and, upon Lessor's request, Lessee shall secure from its mortgagee, landlord or owner of the premises a waiver in form and substance reasonably satisfactory to Lessor.

(g)    Lessor may upon written notice to Lessee advise Lessee that certain items supplied to Lessee are leased to Lessor and supplied to Lessee under the Lease as a sublease. Lessee agrees to execute and deliver such acknowledgments and assignments in connection with such Lease as are reasonably required (including without limitation an acknowledgment of subordination of the Lease to any such superior lease). If, at any time during the term of the Lease, Lessor's right to lease the Equipment expires under such superior lease, Lessor may remove the Equipment from Lessee's premises and shall promptly provide identical substitute Equipment. All expenses of such substitution, including de-installation, installation and transportation expenses, shall be borne by Lessor.

(h)    The obligations of Lessor under the Lease shall be suspended to the extent that it is hindered or prevented from complying therewith because of labor disturbances, including strikes and lockouts, acts of God or the public enemy, fires, storms, accidents, failure of any Supplier to deliver any item, governmental regulations or interferences or any cause whatsoever not within the sole control of Lessor.

(i)    As required by Section 4101(6)(2) of the Small Business Jobs Act of 2010, Lessee certifies to Lessor and to its Assignee(s) that its principals or Lessee and its affiliates have not been convicted of, or pleaded nolo contendere to, a sex offense against a minor or such terms are defined in section 111 of the Sex Offender Registration and Notification Act (42 U.S.C. 16911). The term "principals" is defined as follows: if a sole proprietorship, the proprietor; if a partnership, each managing partner and each partner who is a natural person and holds 20% or more ownership interest in the partnership; and if a corporation, limited liability company, association or a development company, each director, each of the five most highly compensated executives or officers of the entity, and each natural person who is a direct or indirect holder of 20% or more of the ownership stock or stock equivalent of the entity. The term "affiliate" is defined as follows: any company that controls, is controlled by, or is under common control by Lessee. The term "control" is defined as follows: any company where Lessee directly or indirectly or acting through one or more other persons owns, controls, or has power to vote twenty percent or more of any class of voting securities; any company where Lessee controls in any manner the election of a majority of the directors or trustees of the company; any company where Lessee directly or indirectly exercises a controlling influence over the management or policies of the company.

(j)    Any provision of the Master Agreement or any Schedule prohibited by, or unlawful or unenforceable under, any applicable law of any jurisdiction shall be ineffective as to such jurisdiction without invalidating the remaining provisions of the Master Agreement and such Schedule or such jurisdiction or invalidating such provision in any other jurisdiction.

(k)    As an administrative convenience to Lessor and Lessee, Lessee agrees that Lessor shall have the right, without further act or authorization by Lessee, to insert or complete missing or incomplete terms in any Schedule or other document relating to the Lease, including without limitation serial numbers and dates, and to correct manifest errors in such terms; provided that such changes do not materially alter the intent of both parties. Lessee shall execute and deliver such documents and instruments as Lessor may reasonably request in order to confirm any such insertion, completion or correction.

(l)    Lessee agrees that Lessor may charge Lessee, and Lessee agrees to pay Lessor, reasonable administrative fees to perform any action requested by Lessee that Lessor is not otherwise expressly required to perform under the Lease.

(m)    This Lease and each writing executed and delivered by the parties in connection herewith shall be binding upon and shall inure to the benefit of the parties hereto and their permitted successors and assigns.

(n)    If more than one person or entity signs this Master Agreement, then the liability of the undersigned under each Schedule issued pursuant hereto shall be joint and several, and this Master Agreement shall be enforceable in full against each of the undersigned.

(o)    Time is of the essence of this Lease.

The parties have executed this Master Agreement of Terms and Conditions for Lease as of the date first written above.

| | | | | |
|---|---|---|---|---|
| Lessee: | Supreme Manufacturing, Inc. | | Lessor: | Maxus Capital Group, LLC |
| By: | *Neil E. Hoobler* | | By: | *Anthony N. Granata* |
| Print Name: | NEIL E. HOOBLER | | Print Name: | Anthony N. Granata |
| Title: | PRESIDENT | | Title: | Vice President |



**ATTACHMENT A**

To Maxus Lease No. 1425, dated September 2, 2014, between Maxus Capital Group, LLC and Supreme Manufacturing, Inc.

To calculate Stipulated Loss Value, multiply the applicable percentage, below, by the Value of the applicable Item(s) set forth on the Schedule. If no such Value is set forth on the Schedule, the value shall be Lessor's original cost of such Item. Percentage figures represent the percentage after the corresponding rental payment period.

| Rental Month Number | Stip Loss Percent | Rental Month Number | Stip Loss Percent | Rental Month Number | Stip Loss Percent |
|---|---|---|---|---|---|
| 1 | 108.20 | 21 | 87.80 | 41 | 67.40 |
| 2 | 107.18 | 22 | 86.78 | 42 | 66.38 |
| 3 | 106.16 | 23 | 85.76 | 43 | 65.36 |
| 4 | 105.14 | 24 | 84.74 | 44 | 64.34 |
| 5 | 104.12 | 25 | 83.72 | 45 | 63.32 |
| 6 | 103.10 | 26 | 82.70 | 46 | 62.30 |
| 7 | 102.08 | 27 | 81.68 | 47 | 61.28 |
| 8 | 101.06 | 28 | 80.66 | 48 | 60.26 |
| 9 | 100.04 | 29 | 79.64 | 49 | 59.24 |
| 10 | 99.02 | 30 | 78.62 | 50 | 58.22 |
| 11 | 98.00 | 31 | 77.60 | 51 | 57.20 |
| 12 | 96.98 | 32 | 76.58 | 52 | 56.18 |
| 13 | 95.96 | 33 | 75.56 | 53 | 55.16 |
| 14 | 94.94 | 34 | 74.54 | 54 | 54.14 |
| 15 | 93.92 | 35 | 73.52 | 55 | 53.12 |
| 16 | 92.90 | 36 | 72.50 | 56 | 52.10 |
| 17 | 91.88 | 37 | 71.48 | 57 | 51.08 |
| 18 | 90.86 | 38 | 70.46 | 58 | 50.06 |
| 19 | 89.84 | 39 | 69.44 | 59 | 49.04 |
| 20 | 88.82 | 40 | 68.42 | 60 | 48.02 |
| | | | | THEREAFTER | 48.02 |

LESSEE: _____                    LESSOR: _____



# MAXUS
### CAPITAL GROUP

**Personal Guaranty**

To induce Maxus Capital Group, LLC  ("Lessor") to lease equipment to Supreme Manufacturing, Inc. (the "Lessee") pursuant to Master Agreement No. 1425 and all Schedules thereto and documents and instruments relating thereto (individually and collectively, the "Lease") now in existence or hereafter entered into between Lessor and Lessee, the undersigned hereby represents, warrants and covenants as set forth herein below.

1. The undersigned hereby absolutely and unconditionally guarantees to Lessor the full and prompt payment and performance when due of each and every obligation of Lessee under the Lease.

2. The undersigned hereby waives (i) notice of the acceptance hereof by Lessor and of the creation and existence of the Lease and (ii) any and all defenses otherwise available to a surety, guarantor, or accommodation party.

3. This Guaranty is absolute and unconditional, and the liability of the undersigned hereunder shall not be affected or impaired in any way by any of the following, each of which Lessor may agree to without the consent of the undersigned: (a) any extension or renewal of the Lease whether or not for longer than the original period; (b) any change in the terms of payment or other terms of the Lease or any collateral therefor or any exchange, release of, or failure to obtain any collateral therefor; (c) any waiver or forbearance granted to Lessee or any other person liable with respect to the Lease or any release of, compromise with, or failure to assert rights against Lessee or any such other person; and (d) the application or failure to apply in any particular manner any payments or credits on the Lease or any other obligation Lessee may owe to Lessor.

4. Lessor shall not be required before exercising and enforcing its rights under this Guaranty first to resort to demanding performance under the Lease to Lessee or to any other person or attempting to recover against any collateral. The undersigned agrees not to obtain reimbursement or payment from Lessee or any other person obligated with respect to the Lease or from any collateral pledged to secure performance under the Lease until the obligations under the Lease have been fully satisfied.

5. The undersigned shall be and remain liable for any deficiency following foreclosure of any mortgage or security interest securing the Lease, whether or not the liability of Lessee under the Lease is discharged by such foreclosure.

6. The undersigned shall be and remain liable for any deficiency following the initiation of bankruptcy or other insolvency actions affecting the Lease or the Lessee, whether or not the liability of the Lessee is discharged in whole or in part by such action.

7. The undersigned agrees to pay all costs, expenses and attorney fees paid or incurred by Lessor in endeavoring to enforce the Lease and this Guaranty.

8. If any payment from the Lessee or anyone else is applied to the Lease and is thereafter set aside, recovered, rescinded, or required to be returned for any reason (including as a preference in the bankruptcy of Lessee), the obligations under the Lease to which such payment was applied shall for purposes of this Guaranty be deemed to have continued in existence notwithstanding such application, and this Guaranty shall be enforceable as to such obligations as fully as if such application had never been made.

9. If more than one person signs this Guaranty, then the liability of the undersigned hereunder shall be joint and several, and this Guaranty shall be enforceable in full against each of the undersigned.

10. This Guaranty shall be binding upon the estate, heirs, successors and assigns of the undersigned, and shall inure to the benefit of the successors and assigns of Lessor. However, the undersigned shall not assign or delegate any of its obligations hereunder and any attempt to do so shall  be void *ab initio*.

11. By signing this Personal Guaranty, the undersigned authorizes Lessor to obtain the undersigned's Credit Bureau Reports for credit and collection purposes. Prior to and during the term of the Lease, the undersigned will furnish Lessor with personal financial statements, personal tax returns, and related information as may be reasonably requested by Lessor.

12. This Guaranty shall in all respects be governed by, and construed in accordance with, the internal laws of the State of Ohio (the "State"), including all matters of construction, validity and performance.

Hrb 01 2012



13. THE UNDERSIGNED HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES TO SUBMIT TO THE SOLE AND EXCLUSIVE JURISDICTION OF THE STATE AND/OR FEDERAL COURTS IN THE STATE. LESSOR AND THE UNDERSIGNED HEREBY WAIVE THE RIGHT TO TRIAL BY JURY OF ANY MATTERS ARISING OUT OF THIS LEASE OR THE CONDUCT OF THE RELATIONSHIP BETWEEN LESSOR AND THE UNDERSIGNED. EACH OF THE PARTIES ALSO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN ANY COURT IN THE STATE.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

Signature: _Neil E. Hoobler_     Home Address: 231 Streckler Road

Name: _Neil E. Hoobler_     City: _Stoneboro_

Date: _9/2/14_     State: _Pennsylvania_

    Zip: _16153_

Mb 01 2012



## Schedule No. 001, dated September 2, 2014

Incorporating by reference Master Agreement No. 1425 dated September 2, 2014 (the "Master Agreement") between Maxus Capital Group, LLC , as Lessor, and Supreme Manufacturing, Inc., as Lessee.

***LESSEE AGREES TO LEASE THE DESCRIBED EQUIPMENT FROM LESSOR, AND LESSOR BY ACCEPTANCE OF THIS SCHEDULE AGREES TO LEASE THE EQUIPMENT TO LESSEE, ON THE TERMS AND CONDITIONS SET FORTH IN THIS SCHEDULE AND THE MASTER AGREEMENT, WHICH IS INCORPORATED HEREIN BY REFERENCE.***

Equipment Description: All Equipment, whether now owned or existing or hereafter acquired, wherever located from time to time, including but not limited to the Equipment described on the attached Exhibit A, with all replacements, substitutions, replacement parts, additions, repairs, accessions & accessories incorporated therein and/or affixed thereto and all proceeds thereof.

1.  Base monthly Rent:            $4,583.39

2.  Equipment Location:          327 Billy Boyd Rd., Stoneboro, PA 16153

3.  Equipment Return Location:   To be determined by Lessor

4.  Expected Delivery Date:      Unless and until Lessee has executed an Installation Certificate, Lessor may establish the actual delivery date by reference to the shipping records of the Supplier or the shipper or by other reliable means.

5.  Base Term:                   38 months

6.  Lessee Address for Notices (if different from Master Agreement):

7.  Value of Calculation for Stip Loss Value: $150,000.00

8.  Special Terms:               i.) Security Deposit to be held by Lessor in any of its accounts without the payment of interest, and to be applied by Lessor as set forth in Section 19 of the Master Agreement :  $4,583.39.

ii.) Prior to Acceptance:  Prior to the receipt by Lessor of an executed Installation Certificate, including during a period of progress payments, Lessor may, in its sole discretion, cease funding the purchase of Equipment if (a) Lessee does not execute an Installation Certificate prior to September 30, 2014; or (b) Lessor determines in its sole discretion that a material adverse change has occurred in Lessee's financial condition or business, after which determination Lessee will immediately repay all amounts advanced by Lessor plus interest and charges due.

iii.) End of Base Term Options:  Fair Market Value Purchase Option.  Provided no Event of Default or condition which, with the giving of notice or the lapse of time or both, would constitute an Event of Default has occurred and is continuing, Lessee shall have the option at the End of Term, upon notice to Lessor given as provided in Section 2(b) of the Master Agreement, to purchase all, but not less than all, of the Equipment for a purchase price equal to the then fair market value of the Equipment.  For purposes of this paragraph, and in lieu of any other definition thereof, "fair market value" means the purchase price determined by Lessor in its reasonable discretion in accordance with its usual procedures.  Upon receipt of such purchase price, together with any applicable taxes then or thereafter due, Lessor shall execute and deliver to Lessee a bill of sale for the Equipment, without representation or warranty except that the Equipment is free and clear of any Liens, claims or encumbrances created by or through Lessor. Lessee covenants that it will not enter into negotiations for future lease or financing transactions with Lessor's Assignee without prior written consent of Lessor.

iv.)      Provided that no Event of Default shall have occurred and be continuing, Lessee shall be entitled, at its option upon 120 days prior written notice to Lessor, to purchase all but not less than all of the Equipment covered by the Lease, effective as of the calendar day which falls exactly 24 months after the Rent Commencement Date, by paying the Early Purchase Option Amount shown below:

After Rent Payment #24

Early Purchase Option Amount* = $60,825.00

*The Early purchase Option Amount is calculated by multiplying the Early Purchase Option percentage of 40.55% by the Equipment Cost.

v.) Rider R-- Return and Maintenance Rider attached.

MRB 12/11



Schedule Page 2 of 2
Maxus Lease No.  1425-001

9. Financial Covenants.

        i.) Beginning FYE December 31, 2014, owner's withdrawals, compensation, distributions, intercompany transfers, shareholders notes will be prohibited unless a minimum cash flow to debt service ratio of  1.20 to 1.00 is achieved before consideration of said items, once achieved, Lessee can make distributions such that a cash flow debt service coverage of 1.10 to 1.00 is maintained.  The cash flow debt service ratio will be measured as follows: [Net Income (loss) + Depreciation/Amortization + Interest Expense + Management Fees ( as expensed) + noncash expenses -- owner's/partner's withdrawals-distributions-intercompany transfers -- Management Fees ( at the greater of the amount expensed-shareholder loans] / Actual Debt Service, on an annual basis beginning with FYE 12/31/14.

        ii.) Limitation on Distributions -- All owner's/partners' withdrawals, including but not limited to compensation, distributions, salaries, intercompany transfers, management fees, shareholder loans,. etc., will be subordinate to AmeriServ Financial Bank's debt service. In any event, Lessee is subject to an at all times 1.10 to 1.00 cash flow/debt service ratio, to be tested quarterly [on a trailing twelve month basis.

        iii.) Additional debt -- Lessee shall not incur any additional debt without prior written consent of Lessor.

        iv.) No material change in ownership with our written prior consent of Lessor.

        v.) Lessor shall have the unconditional right of first refusal on all financing opportunities with Lessee.

        vi.) Annual Federal Tax Returns of the Lessee to be submitted within 30 days of filing thereof, and in any event, not later than October 31st of each year.

        vii.) Annual Projected Financial Statements, for the Lessee, to be submitted by the first day of each fiscal year.

        viii.) Quarterly Financial Statements of the Lessee to be submitted within 45 days of each quarter end.

THIS SCHEDULE (INCORPORATING THE MASTER AGREEMENT) CONSTITUTES THE ENTIRE AGREEMENT BETWEEN THE LESSOR AND LESSEE AS TO THE LEASE AND THE EQUIPMENT. EXCEPT AS THIS SCHEDULE CONFLICTS WITH OR IS INCONSISTENT WITH THE TERMS OF THE MASTER AGREEMENT AS INCORPORATED HEREIN, THE TERMS OF THE MASTER AGREEMENT ARE UNMODIFIED AND REMAIN IN FULL FORCE AND EFFECT. LESSEE ACKNOWLEDGES THAT ON OR BEFORE LESSEE'S SIGNING OF THIS SCHEDULE IT RECEIVED A COPY OF THE CONTRACT EVIDENCING LESSOR'S ACQUISITION OF THE EQUIPMENT.

Lessee:  Supreme Manufacturing, Inc.        Lessor:  Maxus Capital Group, LLC

By: _Neils Headler_ (signature)        By: _Anthony N Granata_ (signature)

Print Name: _Neil E. Houbler_        Anthony N. Granata

Title: _President_        Vice President

This is Counterpart No. _1_ of 2 serially numbered counterparts. To the extent that this document constitutes chattel paper under the Uniform Commercial Code, no security interest in this document may be created through the transfer and possession of any counterpart other than Counterpart No. 1.

Equipment List Exhibit A  to Maxus Lease Schedule 1425-001

| DESCRIPTION | SERIAL NUMBER |
|---|---|
| **Miscellaneous** | |
| SULLAIR AIR COMPRESSOR | 007-02000358 |
| CLEMCO SAND BLASTING EQUIPMENT | 15777 |
| AIR PUMP | |
| TOOLS & RIGGING | |
| EXHAUST FANS | |
| STORAGE TRAILER | |
| GRACO PAINT EQUIPMENT | BB05530 |
| EXHAUST FANS | |
| STARTING MOTOR | |
| HYDRAULIC PUMP | |
| TOOL & STORAGE TRAILERS & MISC ITEMS (NOT CAPITALIZED-ESTIMATE) | |
| | |
| **OFFICE EQUIPEMENT** | |
| HP DESIGN JET PRINTER | ESA8A08120 |
| DESKS, TABLES & MISC | |
| CNC SOFTWARE | |
| DELL POWEREDGE PC | 1DX2X641 |
| PRO ENGINEERING SOFTWARE | |
| ACT SOFTWARE | |
| VISION COMMUNICATIONS | |
| ACT CONSULTING | |
| DELL INSPIRON 9300 LAPTOP | 43488130465 |
| ACT CONSULTING | |
| QUEST SOFTWARE | |
| ROB'S COMPUTER | 7GB7XB1 |
| PHONE SYSTEM | NT7B75AAAG |
| LAPTOP - AL WOODLEY | |
| BROTHER FAX/COPIER | U81574J6J265448 |
| DISPLAY BOOTH | |
| ACT CONTACT SOFTWARE | |
| TV - VIZIO M370NV | LAQKGWAL3102371 |
| DELL POWEREDGE T410 SERVER | 2BF1F01 |
| ENGINEERING & OFFICE COMPUTERS | |
| FILING CABINETS & MISC ITEMS (NOT CAPITALIZED-ESTIMATE) | |
| | |
| **SHOP EQUIPMENT** | |
| PIRANHA IRON WORKER | P3-3625 |
| HYD-MECH BAND SAW | 21090702 |
| LINCOLN DC400 WELDER | AC-820186 |
| LINCOLN CV400 WELDER | V1950325316 |
| LINCOLN CV400 WELDER | AC-820272 |
| 40 KW D-LINE RECTIFIER | |
| LINCOLN DC400 WELDER | AC-740589 |
| LINCOLN PLASMA CUTTER | |
| LINCOLN CV400 WELDER | V1950325312 |
| LINCOLN CV400 WELDER | AC-820337 |
| MAX 40 PLASMA | 61-002658 |
| PRESS BRAKE 400 TON | 3971 |
| KOKIE CNC CUTTING MACHINE | VG99202 |
| 25 HP AIR COMPRESSOR | 8D11399070 |
| PRESS BRAKE REFURBISHMENT | |
| LINCOLN SP-175 | V1990317323 |
| TIG MAXSTAR WELDER-MILLER 250 | KH315806 |
| 5 TON UNDERHUNG CRANE - 1999 Keystone Crane Com | K9-3979 |

*Ax*
Lessee

*ANG*
Lessor

Equipment List Exhibit A  to Maxus Lease Schedule 1425-001

| DESCRIPTION | SERIAL NUMBER |
|---|---|
| LIFT MAGNET | |
| PRESS BRAKE | |
| MILWAUKEE MAGNETIC DRILL | |
| 20 TON OVERHEAD CRANE - 2002 Ace World  Companie | 10443 |
| YORK PORTABLE LINE BORINING MACHINE | |
| 3 USED WELDERS          AC-620875 | KB117025, KB117015 |
| MILLER BOBCAT 250 D NT WELDER/GENERATOR | LF031072 |
| 10 TON CRANE PONTOON ROLLER | SPH-234-0226-04 |
| 5 TON CRANE - 2006 Keystone Crane Company | KG-5026 |
| AIR COMPRESSOR | |
| TORQUE WRENCH | |
| OMEGA FORK LIFT | OM608T20FS |
| REBUILD CRANE MOTOR | |
| REBUILD GRACO SPRAY EQUIPMENT | |
| AIR COMPRESSORS  MODEL GA26+FF | API314459 & API314173 |
| 10 HYDRAULIC BORING MACHINE | |
| ENERPAC PORT-A-POWER | |
| JIGS, SMALL TOOLS & MISC ITEMS (NOT CAPITALIZED-ESTIMATE) | |

| VEHICLES | |
|---|---|
| INTERSTATE TRAILER | 1UK500G2041047179 |
| BENCH FOR INTERSTATE TRAILER | |
| 2008 3/4 TON CHEVROLET TRUCK | 1GCHK23UX6F256157 |
| 2009 CHEVROLET TAHOE | 1GNFK23089R201611 |
| 2005 CHEVROLET 1500 TRUCK | 2GCEK19BX61312591 |
| 2012 PARKER 20'X8' DECK OVER TRAILER | 13Z0A022C1005509 |

INVENTORY
STEEL, COMPONENTS & HARWARE
CONVEYORS IN PROCESS

As additional collateral to secure Lessee's indebtedness to Lessor, Lessee grants to Lessor a first priority security interest in all of Lessee's right, title and interest in Lessee's accounts, whether now owned or existing or hereafter created, acquired or arising, and all proceeds of teh foregoing.

_Ad._
Lessee

Page 2 of 2

_ANG_
Lessor

Rider R
RETURN AND MAINTENANCE RIDER

September 2, 2014
This Rider is applicable only to the equipment listed under the following headings of Exhibit A to the Schedule: (a) Miscellaneous; (b) Shop Equipment; and (c) Inventory (such equipment, solely for purposes of this Rider, the "Equipment").

Reference is made to Schedule No. 001 (the "Schedule") to Master Agreement No. 1425 dated September 2, 2014 (the "Master Agreement"), each by and between Supreme Manufacturing, Inc., as Lessee, and Maxus Capital Group, LLC, as Lessor. The term "Lease" shall refer to the Schedule which incorporates the Master Lease. Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Lease.

As an inducement for the parties to enter into the Lease, Lessor and Lessee hereby agree as follows:

1.      Physical Condition.  In addition to all other terms and conditions of the Lease relating to maintenance, repair and return of the Equipment, Lessee agrees to comply with the following terms and conditions:

(a)     Lessee agrees to maintain and lubricate the Equipment in accordance with the maintenance manual and lubrication schedule recommended by the original equipment manufacturer ("OEM").  Written records of the lubrication and service will be kept, dated, and confirmed in writing by the appropriate officer or manager of Lessee.

(b)     Replacement parts for the Equipment must be purchased from the OEM or sources approved by the OEM.  Copies of all purchase orders for such replacement parts shall be maintained by Lessee.

(c)     At the time of the return of the Equipment, the Equipment must be fully operational and able to perform its functions as originally intended without repair or overhaul; be clean with all boots, guards and seals fully functional; and be free of rust.

(d)     All warranty and maintenance/repair records for the Equipment shall be returned with the Equipment.

2.      Inspection.  If, after any inspection of the Equipment by Lessor or its agent, a determination is made that the Equipment is not in conformance with the conditions set forth in this Rider or as required by the express terms of the Lease, then Lessor will advise Lessee in writing as to such discrepancies.  Lessee shall have 30 days after the list of discrepancies to repair or correct same at its sole expense.  Lessee will pay all expenses for a re-inspection by Lessor or its agent if additional corrective measures are still required.

3.      Storage.  If Lessee has not exercised its purchase option for the Equipment, then for a period of 120 days after the End of Term, Lessor shall have the right to conduct a private sale or an auction of the Equipment from Lessee's facility with Lessee's full cooperation and assistance.  During this 120-day period, Lessee shall: (a) cause the Equipment to remain operational; (b) insure the Equipment in accordance with the terms of the Lease; and (c) provide adequate electrical power, lighting, heat, water and compressed air, as applicable, necessary to maintain and demonstrate the Equipment to any potential buyer.  During this 120-day period, Lessee shall not deinstall, disassemble or return the Equipment to Lessor until the earlier of the end of the 120-day period or a date specified by Lessor.

1                                          Rider R
                                      Maxus Lease 1425-001

4.    Removal, Packaging, Transportation.  In addition to all other terms and conditions of the Lease as it relates to the return of the Equipment, Lessee agrees to comply with the following terms and conditions:

(a) When returning any Equipment, any special transportation devices, such as metal skids, lifting slings and brackets, which were provided with the Equipment when originally delivered must be used.

(b) Lessee shall: block all sliding members; properly secure any chains, pulleys, gearing, drums, hooks, control box and wiring and any other swinging components; and wrap, box, band and label all other components.  All such work shall be done in a conscientious and workman like manner so as to facilitate the efficient reinstallation of the Equipment.

(c) All wheels, rails, supports and other hardware installed related to the Equipment shall be similarly deinstalled and prepared for shipment on appropriate skids. None of the cross members and rails will have a deformity of any kind.

(d) All process fluids shall be removed from the Equipment and disposed of in accordance with prevailing waste disposal laws and regulations. Materials which are designated as "hazardous materials" by any federal or state regulatory authority may not be shipped with the Equipment.

(e) All internal fluids associated with the Equipment, such as lubricating oil and hydraulic oil, shall conform to the OEM's specifications.  All internal fluid systems shall be filled to operating levels.  Filler caps are to be secured and disconnected hoses are to be sealed to prevent spillage.

(f) All lock keys are to be wired together and secured to a major external component of the Equipment.

(g) None of the heating, cooling and hydraulic equipment will have any system leaks. All fluids should be drained properly.

(h) All tanks and hoses shall be fluid tight.  Frayed and worn hoses and cables are to be replaced by new hoses and cables which meet or exceed OEM's specifications.

(i) All sheet metal and fabricated housings and panels will be in good appearance and repair, and not dented or modified.

(j) All aspects of the machine will operate at the OEM's specifications.

(k) All Equipment and appurtenances shall be free of all decals and markings, other than those affixed by the OEM.  In-plant custom numbering and labeling, if any, will be removed prior to return.

(l) The Equipment will be clean and in good appearance and any repairs or painting done in a professional manner to OEM specifications.

(m) The Equipment and appurtenances will be in suitable condition for immediate and continued use in service for which it was designed and built.

2                                Rider R
                            Maxus Lease 1425-001

(n) Lessee shall provide the same electrical wiring, appurtenances, prints, schematics, operations manuals, software and auxiliary equipment as received when first delivered.

(o) Lessee shall provide updated and current release software as available from the manufacturer.

(p) All safety limit switches, interlocks, motion – no motion switches, drop bar safety, and safety warning signs are to be installed and operating properly.

(q) Pumps and motors shall be quiet, not in need of maintenance or repair and shall perform at 100% of OEM's original specifications without slippage. .

Except as expressly amended by this Rider, the Lease remains unchanged and in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Rider effective as of the date listed above.

Lessee: Supreme Manufacturing, Inc.

By: _____

Print Name: _NEIL E. HOOBER_____

Title: _PRESIDENT_____

Lessor: Maxus Capital Group, LLC

By: _____

Print Name: _Anthony N. Granata___

Title: _Vice President_____

3

Rider R
Maxus Lease 1425-001



MAXUS
CAPITAL GROUP

**Installation Certificate for Schedule No. 001, dated September 2, 2014**

Incorporating by reference Master Agreement No. 1425 dated September 2, 2014 between Maxus Capital Group, LLC , as Lessor, and Supreme Manufacturing, Inc., as Lessee.

**Lessee hereby certifies (i) that the All Equipment,** whether now owned or existing or hereafter acquired, wherever located from time to time, including but not limited to the Equipment described on the attached Exhibit A, with all replacements, substitutions, replacement parts, additions, repairs, accessions & accessories incorporated therein and/or affixed thereto and all proceeds thereof, have been delivered to the specified Equipment Location, and inspected by Lessee and have been found to be in good order as of the Installation Date, and (ii) that the quantity, description, and serial numbers as indicated below are true and correct.

Installation Date: _9/2/14_

Equipment Location: 327 Billy Boyd Rd., Stoneboro, PA 16153

Lessee hereby represents and warrants to Lessor that on the Installation Date:

1. The representation and warranties of Lessee contained in the Master Agreement and the Schedule are true and correct in all material respects as though made as of the Installation Date.

2. No Event of Default as defined in the Master Agreement has occurred and is continuing as of the Installation Date.

3. There are in full force and effect such insurance policies with respect to the Equipment as are required pursuant to the Master Agreement.

Lessee:      Supreme Manufacturing, Inc.

By:      _Neil E. Hoobler_

Print Name:      _Neil E. Hoobler_

Title:      _President_

*This is Counterpart No. **1** of 2 serially numbered counterparts. To the extent that this document constitutes chattel paper under the Uniform Commercial Code, no security interest in this document may be created through the transfer and possession of any counterpart other than Counterpart No. 1.*

Equipment List Exhibit A to Maxus Lease Schedule 1426-001

| DESCRIPTION | SERIAL NUMBER |
|---|---|
| **Miscellaneous** | |
| SULLAIR AIR COMPRESSOR | 007-02000356 |
| CLEMCO SAND BLASTING EQUIPMENT | 15777 |
| AIR PUMP | |
| TOOLS & RIGGING | |
| EXHAUST FANS | |
| STORAGE TRAILER | |
| GRACO PAINT EQUIPMENT | BB05530 |
| EXHAUST FANS | |
| STARTING MOTOR | |
| HYDRAULIC PUMP | |
| TOOL & STORAGE TRAILERS & MISC ITEMS (NOT CAPITALIZED-ESTIMATE) | |
| | |
| **OFFICE EQUIPEMENT** | |
| HP DESIGN JET PRINTER | ESA8A08120 |
| DESKS, TABLES & MISC | |
| CNC SOFTWARE | |
| DELL POWEREDGE PC | 1DX2X641 |
| PRO ENGINEERING SOFTWARE | |
| ACT SOFTWARE | |
| VISION COMMUNICATIONS | |
| ACT CONSULTING | |
| DELL INSPIRON 9300 LAPTOP | 43488130465 |
| ACT CONSULTING | |
| QUEST SOFTWARE | |
| ROB'S COMPUTER | 7GB7XB1 |
| PHONE SYSTEM | NT7B76AAAG |
| LAPTOP - AL WOODLEY | |
| BROTHER FAX/COPIER | U61574J6J265448 |
| DISPLAY BOOTH | |
| ACT CONTACT SOFTWARE | |
| TV - VIZIO M37ONV | LAQKGWAL3102371 |
| DELL POWEREDGE T410 SERVER | 28F1F01 |
| ENGINEERING & OFFICE COMPUTERS | |
| FILING CABINETS & MISC ITEMS (NOT CAPITALIZED-ESTIMATE) | |
| | |
| **SHOP EQUIPMENT** | |
| PIRANHA IRON WORKER | P3-3625 |
| HYD-MECH BAND SAW | 21090702 |
| LINCOLN DC400 WELDER | AC-820186 |
| LINCOLN CV400 WELDER | V1950325316 |
| LINCOLN CV400 WELDER | AC-820272 |
| 40 KW D-LINE RECTIFIER | |
| LINCOLN DC400 WELDER | AC-740589 |
| LINCOLN PLASMA CUTTER | |
| LINCOLN CV400 WELDER | V1950325312 |
| LINCOLN CV400 WELDER | AC-820337 |
| MAX 40 PLASMA | 61-002658 |
| PRESS BRAKE 400 TON | 3971 |
| KOKIE CNC CUTTING MACHINE | VG99202 |
| 25 HP AIR COMPRESSOR | BD11399070 |
| PRESS BRAKE REFURBISHMENT | |
| LINCOLN SP-175 | V1990317323 |
| TIG MAXSTAR WELDER-MILLER 250 | KH315866 |
| 5 TON UNDERHUNG CRANE - 1999 Keystone Crane Com | K0-3979 |

_AH._
Lessee

_ANG_
Lessor

Equipment List Exhibit A  to Maxus Lease Schedule 1425-001

| DESCRIPTION | SERIAL NUMBER |
|---|---|
| LIFT MAGNET | |
| PRESS BRAKE | |
| MILWAUKEE MAGNETIC DRILL | |
| 20 TON OVERHEAD CRANE - 2002 Ace World  Companie | 10443 |
| YORK PORTABLE LINE BORING MACHINE | |
| 3 USED WELDERS        AC-620675 | KB117025, KB117015 |
| MILLER BOBCAT 250 D NT WELDER/GENERATOR | LF031072 |
| 10 TON CRANE PONTOON ROLLER | SPH-234-0228-04 |
| 5 TON CRANE - 2006 Keystone Crane Company | K5-5025 |
| AIR COMPRESSOR | |
| TORQUE WRENCH | |
| OMEGA FORK LIFT | OM606T20FS |
| REBUILD CRANE MOTOR | |
| REBUILD GRACO SPRAY EQUIPMENT | |
| AIR COMPRESSORS  MODEL GA26+FF | API314459 & API314173 |
| 10 HYDRAULIC BORING MACHINE | |
| ENERPAC PORT-A-POWER | |
| JIGS, SMALL TOOLS & MISC ITEMS (NOT CAPITALIZED-ESTIMATE) | |

| VEHICLES | |
|---|---|
| INTERSTATE TRAILER | 1UK500G2041047179 |
| BENCH FOR INTERSTATE TRAILER | |
| 2006 3/4 TON CHEVROLET TRUCK | 1GCHK23UX6F256157 |
| 2009 CHEVROLET TAHOE | 1GNFK23089R201611 |
| 2005 CHEVROLET 1500 TRUCK | 2GCEK19BX51312591 |
| 2012 PARKER 20'X8' DECK OVER TRAILER | 13Z0A022C1005509 |

INVENTORY
STEEL, COMPONENTS & HARWARE
CONVEYORS IN PROCESS

As additional collateral to secure Lessee's indebtedness to Lessor, Lessee grants to Lessor a first priority security
interest in all of Lessee's right, title and interest in Lessee's accounts, whether now owned or existing or hereafter
created, acquired or arising, and all proceeds of teh foregoing.

_AAl._
Lessee

Page 2 of 2

_ANG_
Lessor



# MAXUS
## CAPITAL GROUP

**Schedule No. 002, dated March 17, 2015**

Incorporating by reference Master Agreement No. 1425 dated September 2, 2014 (the "Master Agreement") between Maxus Capital Group, LLC, as Lessor, and Supreme Manufacturing, Inc., as Lessee.  This Schedule No. 002, as it incorporates the Master Agreement, is referred to herein as the "Lease."

*LESSEE AGREES TO LEASE THE DESCRIBED EQUIPMENT FROM LESSOR, AND LESSOR BY ACCEPTANCE OF THIS LEASE AGREES TO LEASE THE EQUIPMENT TO LESSEE, ON THE TERMS AND CONDITIONS SET FORTH IN THIS LEASE AND THE MASTER AGREEMENT, WHICH IS INCORPORATED HEREIN BY REFERENCE.*

Equipment Description:  The inventory consisting of the component parts necessary to construct One (1) SMI-16 Yard Twin -- MD (Mine Duty Gantry) Dredge (all of the foregoing, whether characterized as "equipment" or "inventory", as each such term is defined in Article 9 of the Uniform Commercial Code as adopted by the State of Ohio, is referred to herein, collectively, as the "Equipment"), as such parts are further detailed and referenced in purchase order No. 313596 dated October 2, 2014, as amended, (the "Purchase Order") between Lessee and Sully-Miller Contracting Company dba United Rock Products ("United Rock Products"), with all replacements, substitutions, replacement parts, additions, repairs, accessions, accessories, work in progress incorporated therein and/or affixed thereto, and all proceeds thereof. A true and correct copy of the Purchase Order is attached hereto as Exhibit "A".

1.  Base monthly Rent:

    The amount calculated by multiplying the monthly rent factor of 0.6333% by the total amount of funds advanced by Lessor hereunder divided by 30 and then multiplied by the actual number of days outstanding.

2.  Equipment Location:

    327 Billy Boyd Rd., Stoneboro, PA 16153 and various locations approved by Lessor.

3.  Expected Delivery Date:

    Lessor may establish the actual delivery date by reference to the shipping records of the supplier of the components, the shipper or by other reliable means.

4.  Base Term:

    12 months from the date of this Schedule.

5.  Lessee Address for Notices (if different from Master Agreement):  N/A

6.  Value of Calculation for Stipulated Loss Value:  $8,166,700.00

7.  Special Terms:

    i.)  Security Deposit to be held by Lessor in any of its accounts without the payment of interest, and to be applied by Lessor as set forth in Section 19 of the Master Agreement:  Not applicable.

    ii.)  Section 17 (a) of the Master Agreement is hereby amended by adding the following clause thereto as an "Event of Default": "(9) Lessee is in default in the payment or performance of any obligation under any lease with Lessor, whether a lease originated by Lessor or one by which Lessor is lessor by virtue of an assignment."

    iii.)  To further secure Lessee's obligations owing to Lessor, Lessee hereby grants Lessor a security interest in all of its assets (the "Additional Collateral"), whether now owned or hereafter acquired by Lessee, including, but not limited to, all of the following assets of Lessee (capitalized terms used below in this Section 7(iii) of this Lease have the meaning given to them by Article 9 of the Uniform Commercial Code as adopted by the State of Ohio unless defined otherwise herein):  General Intangibles; Accounts and Deposit Accounts; Tangible and Electronic Chattel Paper; Goods; Fixtures; Instruments; Promissory Notes; Letter-of-Credit rights and advances of credit, except those subject to Regulation U; life insurance policies; Supporting Obligations; Equipment; Furniture; Inventory; Software; Documents; and Investment Property; all Proceeds in connection with the aforementioned property including, but not limited to, all rents, revenues, issues, profits, and any other form of value received from the sale, lease, license, encumbrance, collection or other disposition; and all ledger receipts, books, records, documents, computer records, programs, storage media, and software evidencing any and all of the foregoing.  Notwithstanding the foregoing, the Additional Collateral shall not include any deposit accounts maintained by Lessee for employee payroll and payroll withholding taxes. Said Additional Collateral shall secure not only the amounts which Lessee is obligated to pay under this Lease, but also all other present and future indebtedness or obligations of Lessee to Lessor of every kind and nature whatsoever.



PLAINTIFF'S EXHIBIT

Schedule No. 002
Maxus Lease No. 1425-002
Page 2 of 5

iv.) Lessee shall periodically submit draw requests to Lessor in the form attached hereto as Exhibit "B" (a "Request for Advance") for: (a) payment to Lessee's vendors for purchases of Equipment; (b) reimbursement of costs incurred by Lessee in the fabrication of the Equipment and the production of the SMI-16 Yard Twin – MD (Mine Duty Gantry) Dredge contemplated under the Purchase Order (the "Dredge"); and (c) amounts due Lessor under this Lease. Any draw request representing labor shall only be made once a calendar month and shall be paid to the extent of actual labor costs incurred by Lessee for that particular month. Lessee may submit draw requests to Lessor for payment, other than labor, no more often than twice a month, by the 5th and 20th of each month or, if such a day is not a business day, then on the immediately following business day. Each draw request for payment to Lessee's vendors for purchases of Equipment shall be accompanied by a true and correct copy of (i) Lessee's purchase order to the vendor, (ii) the vendor's invoice, (iii) if the materials are to be delivered to Lessee's site, the bill of lading or other proof of delivery of the materials to Lessee's site in a form acceptable to Lessor, or (iv), if Lessee is the supplier of the component parts, an invoice to Lessor. As to overhead costs and the like, Lessee shall furnish Lessor with evidence of those costs in such form as is reasonably acceptable to Lessor and its Assignee. Each Request for Advance shall be in an amount not less than One Hundred Thousand and no/100 Dollars ($100,000.00), or such lesser amount as Lessor may accept in its sole discretion. Within five (5) business days of its receipt of a draw request complying with the terms of this Section 7(iv), provided no Event of Default or condition which, with the giving of notice or the passage of time or both, would constitute an Event of Default has occurred and is continuing, Lessor shall cause payment to be made in accordance with the Request for Advance. In no event shall the aggregate amount of the advances made by Lessor to Lessee pursuant to this Lease exceed Six Million and no/100ths Dollars ($6,000,000.00). Moreover, Lessee shall not submit, and Lessor shall not be obligated to honor, a Request for Advance if the dollar amount of such Request, when added to the aggregate amount of all previous Requests for Advances, exceeds the sum of the then aggregate accrued Milestone amounts as of the date of the Request for Advance, as such Milestone amounts are listed on Exhibit "B" to the Purchase Order. By way of example and not limitation, the aggregate Milestone amounts as of May 14, 2015 total $4,045,670.10; therefore, the aggregate amount of the Requests for Advances made by Lessee through May 14, 2015, shall not exceed $4,045,670.10. The first Request for Advance shall include, among other payments, the payment to Lessor of (i) $163,334.00 representing the issuance fee as set forth in the Commitment Letter dated February 18, 2015 from Lessor to Lessee and (ii) $30,000.00 to be held in an account at AmeriServ Financial Bank (Lessor's "Assignee") owned by Lessee, but pledged to Lessor subject to an agreement mutually acceptable to Lessor, Lessee, and Assignee, which monies will be used to pay reasonably anticipated legal expenses to be incurred by Lessor or its Assignee in the event United Rock Products fails to perform under its Purchase Order.

v.) Lessor will have the right to cease making advances hereunder and Lessee will immediately repay all amounts advanced by Lessor hereunder plus Base monthly Rent and other charges due if Lessor determines in its sole discretion that: (a) the progress of Lessee's construction of the Dredge is not in compliance with the Milestone dates as set forth in Exhibit "B" of the Purchase Order; (b) Lessee is unable to ship the Dredge components to the Buyer's Location (as such term is defined in the Purchase Order) on or before December 2, 2015; (c) a material adverse change has occurred in Lessee's financial condition or business; or (d) an Event of Default has occurred and is continuing.

vi.) Provided no Event of Default or condition which, with the giving of notice or the passage of time or both, would constitute an Event of Default has occurred and is continuing, Lessee must, at the expiration of the Base Term, purchase all, but not less than all, of the Equipment for a purchase price equal to the greater of the following: (a) the then fair market value of the Equipment (as hereinafter defined) or (b) the aggregate of all amounts advanced by Lessor hereunder plus all accrued and unpaid Base monthly Rent and any other charges due hereunder. As used herein, the term "End of Lease Option" refers to Lessee's obligation to purchase the Equipment pursuant to this Section 7(vi). For purposes of this Section 7(vi), and in lieu of any other definition thereof, "fair market value" means the purchase price determined by Lessor in its reasonable discretion in accordance with its usual procedures. Upon receipt of such purchase price, together with any applicable taxes then or thereafter due, Lessor shall execute and deliver to Lessee a bill of sale for the Equipment, without representation or warranty except that the Equipment is free and clear of any liens, claims or encumbrances created by or through Lessor. Lessee covenants that until complete satisfaction of its obligations owing Lessor under this Lease, including, without limitation, its payment of the Early Purchase Option Amount or End of Lease Option, it will not enter into negotiations for future lease or financing transactions with Lessor's Assignee without the prior written consent of Lessor.

vii.) Provided that no Event of Default or condition which, with the giving of notice or the passage of time or both, would constitute an Event of Default has occurred and is continuing, Lessee may purchase all but not less than all of the Equipment covered by this Lease, effective as of the date of the delivery of the Dredge components to the Buyer's Location (as such term is defined in the Purchase Order), by paying Lessor the "Early Purchase Option Amount" defined below:

The Early Purchase Option Amount is equal to the sum of all advances made by Lessor to Lessee hereunder, plus any and all unpaid amounts then due and owing Lessor under this Lease, including but not

Schedule No. 002
Maxus Lease No. 1425-002
Page 3 of 5

limited to, unpaid rent, expenses, penalties or fees due or to become payable to Lessor upon lease expiration or termination.

viii.) Lessee hereby grants to Lessor non-exclusive rights of use and license, without cost, to all intellectual property and other proprietary technology related to the Dredge until complete satisfaction of its obligations owing Lessor under this Lease, including, without limitation, its payment of any of the Early Purchase Option Amount or End of Lease Option. Upon Lessee's complete satisfaction of its obligations owing Lessor under this Lease, including, without limitation, its payment of any of the Early Purchase Option Amount or End of Lease Option, Lessor's license to such intellectual property and other proprietary technology shall expire.

ix.) In addition to Lessor's rights under Section 9(a) of the Master Agreement, Lessee hereby grants Lessor oversight authority of the Dredge construction which will be done on a periodic basis and include site visits at both Lessee's and its sub-contractors' locations. Upon execution of this Lease, Lessee shall prepare and deliver to Lessor an Excel spreadsheet detailing anticipated Milestone dates and work to be completed by said dates (the "Milestone Report"). During the Base Term, Lessee shall deliver a monthly report to Lessor on the fifth day of each month updating the Milestone Report, including a percentage towards completion of the Dredge. Failure to deliver such monthly report to Lessor within five business days of its due date shall constitute an Event of Default hereunder. Lessee shall pay Lessor a monthly servicing fee for such oversight services, plus reimburse Lessor for any and all expenses incurred by Lessor in monitoring the construction and fabrication of the Dredge, including travel expenses related to Lessor's site visits. Lessee acknowledges and agrees that any inspections, oversight services, or monitoring performed by Lessor hereunder shall be for the sole and exclusive benefit of Lessor and its Assignee and shall not be relied upon by Lessee for any purpose whatsoever.

x.) As additional collateral to secure Lessee's obligations owing to Lessor and/or its Assignee, Lessee shall cause United Rock Products, or an affiliate thereof, to secure a standby letter of credit and a documentary letter of credit, each (a) in a form and substance satisfactory to Lessee and its Assignee, (b) naming Lessee as beneficiary and (c) to be issued by Crédit Agricole Corporate and Investment Bank, New York Branch. The standby letter of credit shall be in the amount of Eight Hundred Sixteen Thousand Six Hundred Seventy and no/100 Dollars ($816,670.00) (the "10% LC") and the documentary letter of credit shall be in the amount of Six Million One Hundred Twenty-Five Thousand Twenty-five and no/100 Dollars ($6,125,025.00) (the "75% LC"). Lessee shall strictly comply with and shall do all things necessary and appropriate to satisfy the terms and conditions the 10% LC and the 75% LC such that the full amount available under each such letters of credit shall be applied towards the Lessee's obligations under this Lease, including without limitation, Lessee's payment of the Early Purchase Option Amount or End of Lease Option.

xi.) Lessee hereby assigns and grants a security interest to Lessor in of all of Lessee's right, title, and interest in and to the 10% LC and the 75% LC, including but not limited to all Proceeds (as hereinafter defined) and rights to payment in connection with such letters of credit. As used in this Lease, the term "Proceeds" has the same meaning ascribed to that term under Article 9 of the Uniform Commercial Code as adopted by the State of Ohio. Upon request of Lessor or its Assignee, Lessee shall provide written notification and/or confirmation to the issuing bank, nominated bank, confirming bank, and any other persons or entities as Lessor may deem necessary or appropriate of the assignment and security interest granted to Lessor hereunder in the letters of credit contemplated herein and such written notice and/or confirmation shall be in form and substance satisfactory to Lessor and its Assignee.

xii.) Lessee hereby assigns to Lessor all of its rights, but none of its obligations, in the Purchase Order, including its right to receive the 10% down payment and the 75% payment due from United Rock Products under the Purchase Order and all Proceeds in connection with the Purchase Order. Lessee shall promptly and timely provide Lessor with a copy of any notice it receives from United Rock Products during the Base Term, including, but not limited to, any notice of termination of the Purchase Order. Lessee shall also deliver to Lessor evidence of delivery of all of the Dredge components to the Buyer's Location in the form of copies of the related bills of lading.

xiii.) Upon the occurrence of an Event of Default, Lessor may, in addition to all rights and remedies it has under Section 17(b) of the Master Agreement, take possession of and utilize any materials, plant, tools, equipment and property of any kind owned or leased by Lessee and may exercise all of the rights of Lessee under any subcontracts that Lessee has entered into with respect to any of the Equipment, in order to (a) complete the delivery of the Dredge components in accordance with the terms of the Purchase Order, or (b) to complete the components of the Dredge for sale to a third party. Notwithstanding any other provision of this Lease to the contrary, the remedies in this Section 7 (xiii) and elsewhere in this Lease provided in favor of Lessor are not exclusive but are cumulative and may be exercised concurrently or consecutively and will be in addition to all other remedies in Lessor's favor under this Lease, at law or in equity.

8.  Additional Covenants.

Schedule No. 002
Maxus Lease No. 1425-002
Page 4 of 5

       i)  Prior to submitting any Request for Advance hereunder, Lessee shall obtain and deliver to Lessor the written consent of United Rock Products to the assignment by Lessee of the Purchase Order, any interest therein and any money due or to become due thereunder, to Lessor and its Assignee.

       ii)  Throughout the term of this Lease, Lessee shall (a) promptly and timely comply with all of its obligations under the Purchase Order, and (b) comply, and cause its subcontractors to comply with, the insurance requirements described in Section 13(c) of the "General Terms and Conditions" of the Purchase Order.

9.   Financial Covenants.

       i.)  Beginning with fiscal year ended December 31, 2014, owner's withdrawals, compensation, distributions, intercompany transfers, shareholder notes will be prohibited as to Lessee unless a minimum CF/DS Ratio (as hereinafter defined) of 1.20 to 1.00 is achieved before consideration of said items. Once achieved, Lessee may make such distributions so long as a CF/DS Ratio of 1.10 to 1.00 is maintained. Any such distribution shall be subordinate to AmeriServ Financial Bank's debt service. The "CF/DS Ratio" is defined as follows: [net income (loss) + depreciation/amortization + interest expense + management fees (as expensed) + noncash expenses - owner's/partner's withdrawals - distributions - intercompany transfers - management fees (as expensed) – shareholder loans] ÷ actual debt service, on an annual basis.

       ii.)  Until complete satisfaction of its obligations owing Lessor under this Lease, including, without limitation, its payment of any of the Early Purchase Option Amount or End of Lease Option, Lessee shall not incur any additional debt without prior written consent of Lessor.

       iii.)  No material change in ownership with out written prior consent of Lessor.

       iv.)  Until complete satisfaction of its obligations owing Lessor under this Lease, including, without limitation, its payment of any of the Early Purchase Option Amount or End of Lease Option, Lessor shall have the unconditional right of first refusal on all financing opportunities with Lessee.

10.  Financial Reporting Requirements

Lessee shall promptly provide or cause to be promptly provided the following financial information to Lessor and its Assignee:

       i.)  Within 30 days of Lessee's fiscal year end and commencing with the fiscal year ending December 31, 2014, Lessee's annual company prepared financial statements;

       ii.)  Within 30 days of filing, but in any event no later than October 31st of each year, Lessee's annual federal income tax returns (complete with all worksheets, notes and schedules), which shall be in form and content satisfactory to Lessor and Assignee;

       iii.)  No later than the first (1st) day of each fiscal year of Lessee, Lessee's annual projected financial statements; and

       iv.)  Within thirty (30) days of each quarter end, Lessee's internally prepared quarterly financial statements.

[THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK]
[SIGNATURES ON FOLLOWING PAGE]

Schedule No. 002
Maxus Lease No. 1425-002
Page 5 of 5

THIS SCHEDULE NO. 002 (INCORPORATING THE MASTER AGREEMENT) CONSTITUTES THE ENTIRE AGREEMENT BETWEEN THE LESSOR AND LESSEE AS TO THE LEASE AND THE EQUIPMENT. EXCEPT AS THIS SCHEDULE NO. 002 CONFLICTS WITH OR IS INCONSISTENT WITH THE TERMS OF THE MASTER AGREEMENT AS INCORPORATED HEREIN, THE TERMS OF THE MASTER AGREEMENT ARE UNMODIFIED AND REMAIN IN FULL FORCE AND EFFECT. LESSEE ACKNOWLEDGES THAT ON OR BEFORE LESSEE'S SIGNING OF THIS LEASE IT RECEIVED A COPY OF THE CONTRACT EVIDENCING LESSOR'S ACQUISITION OF THE EQUIPMENT.

Lessee:  Supreme Manufacturing, Inc.                    Lessor:  Maxus Capital Group, LLC

By: _____ 3/13/15              By: _____

Print
Name: _____                      Anthony N. Granata
Title: _____                      Vice President

This is Counterpart No. ___ of 2 serially numbered counterparts. To the extent that this document constitutes chattel paper under the Uniform Commercial Code, no security interest in this document may be created through the transfer and possession of any counterpart other than Counterpart No. 1.

*Exhibit A to Maxus Lease Schdule 1425-002*



# PURCHASE ORDER

The purchase order number must appear on all delivery slips and invoices.

Purchase Order No.: 313598
Order Revision No.: 0

| | | | | |
|---|---|---|---|---|
| Supplier No.: | 10105554 | Vendor: | Supremo Manufacturing, Inc.<br>327 Billy Boyd Road<br>Stoneboro PA 16153 | Ship To: United Rock Products<br>1245 E. Arrow Highway<br>Irwindale CA 91706 |
| Tax ID: | 25-1646108 | | | |

| Order Date | Order Type | Carrier | Freight Terms | Payment Terms |
|---|---|---|---|---|
| 10/2/2014 | OC | | | Due Upon Receipt |

If there are any questions concerning this purchase order, please contact:

Name: Michael E Hill
Phone: (714) 578-9600

Currency: USD
Page: Page 1 of 3

| Line No | Promise Delivery | Quantity | UoM | Item No. | Description | Unit Cost | Extended Cost |
|---|---|---|---|---|---|---|---|
| 1 | 10/2/2014 | 1.00 | EA | 1 | CIP Equipment | 8,166,700.00 | 8,166,700.00 |

This Supersedes all prior versions of this Purchase Order

* Scope of Supply:

Suily-Miller Contracting Company doing business as United Rock Products (hereinafter known as "Buyer") agrees to purchase the CIP Equipment that shall be furnished by Supremo Manufacturing, Inc. (hereinafter known as "Seller" or "Supplier") as per the Supremo Manufacturing 10 Yard Twin Dredge Quotation dated November 4, 2014, pages 2-9 only, attached hereto as Exhibit A, except as specifically modified herein. It is acknowledged and agreed that Exhibit A is included for informational purposes only to provide a general description of the CIP Equipment and the related scope of work for fabrication, delivery, assembly, start-up and training of the CIP Equipment, and that all equipment, parts, services and labor necessary for the CIP Equipment to operate for its intended purpose is included, whether or not specifically called out in Exhibit A. The Seller shall arrange and pay for the shipping of the CIP Equipment to United Rock Products Job Site Location (hereinafter known as "Buyer's Location") within two miles of 2500 Avenida Barbosa, Irwindale, CA 91706 and the complete assembly of the CIP Equipment. Seller shall also provide two (2) weeks of onsite training by an experienced dredge operator reasonably acceptable to Buyer. Seller shall have no obligation to provide additional training to Buyer personnel if said employees are absent from work at any time during such training period.

* Payment Terms:

10 % (of the Purchase Price) Down Payment shall be due and payable by Buyer to Seller immediately upon (a) Buyer's termination of the Purchase Order, or (b) if the Purchase Order is not so terminated, upon Seller's delivery of all Seller supplied Dredge Components and equipment at Buyer's location. This 10% Down Payment will be guaranteed by an irrevocable standby letter of credit in form and substance acceptable to Buyer.

75% Upon Seller's delivery of all Seller supplied Dredge Components & equipment at Buyer's Location.

15% within thirty (30) days after Buyer determines, in good faith, that the CIP Equipment has been completely assembled and is operating properly for its intended purpose and that Seller has provided Buyer with the two week training period described above. Said thirty (30) day period shall not be tolled if Buyer fails to timely supply Seller with Buyer supplied features and components for incorporation by Seller into the CIP Equipment.

Buyer may conduct inspections, at mutually convenient times but at least once every (60) Days from the date of this Order, of the status of the work. Prior to conducting any such inspection, Buyer shall provide Seller with evidence that such inspectors are covered by workers compensation insurance. In addition, such inspectors shall comply with all of Seller's safety and security procedures. Seller shall promptly and timely cure any discrepancies noted in Buyer's inspection.

| | |
|---|---|
| | Sales Tax: 0.00 |
| | Total: 8,166,700.00 |

Mail invoices to:

United Rock Products
1245 E. Arrow Highway
Irwindale CA 91706

Supplier Signature: _Neil S. Kobler_ 9/18/15

Buyer Signature: _____

THE SUPPLIER SIGNATORY ABOVE HAS THE AUTHORITY AND KNOWLEDGE TO BIND THE SUPPLIER TO THE CONTRACT AND AGREES TO THE TERMS & CONDITIONS. SUPPLIER AGREES TO CONFORM WITH TERMS STATED IN TERMS & CONDITION ATTACHMENT.

*Exhibit A to Maxus Lease Schdule 1425-002*



## PURCHASE ORDER

The purchase order number must appear on all documents and invoices

Purchase Order No.: 313595
Order Revision No.: 0

| Supplier No.: | 10165554 | Vendor: | Supreme Manufacturing, Inc.<br>327 Billy Boyd Road<br>Stoneboro PA 16153 | Ship<br>To: | United Rock Products<br>1245 E. Arrow Highway<br>Irwindale CA 91706 |
|---|---|---|---|---|---|
| Tax ID: | 25-1646108 | | | | |

| Order Date | Order Type | Carrier | Freight Terms | Payment Terms |
|---|---|---|---|---|
| 10/2/2014 | OC | | | Due Upon Receipt |

If there are any questions concerning this purchase order, please contact:

| Name: | Michael E Hill | Currency: | Page: |
|---|---|---|---|
| Phone: | (714) 678-9600 | USD | Page 2 of 3 |

| Line No | Promise Delivery | Quantity | UoM | Item No. | Description | Unit Cost | Extended Cost |
|---|---|---|---|---|---|---|---|

**Timing:**
The CIP Equipment shall be fully delivered, assembled and in full satisfactory operation, for its intended purpose as determined in good faith by Buyer ("Final Delivery") within one year of February 27, 2015 (the "Due Date"). As an incentive for early completion, the Buyer shall pay the Seller a bonus of $4,200 per day prior to the Due Date that the Seller achieves Final Delivery, not to exceed $250,000.00. In addition, the Seller has been informed by Buyer that the CIP Equipment is vital to the commercial operations of the Buyer, and that any failure to achieve Final Delivery by the Due Date will result in economic harm to the Buyer. As such, the Seller shall be liable to the Buyer in the amount of $4,200 ("Liquidated Damages") for each day after the Due Date that the Seller fails to achieve Final Delivery, not to exceed $250,000.00. The Seller acknowledges that the actual damages which the Buyer may incur for a failure of Seller to achieve Final Delivery by the Due Date are difficult to estimate, and that these Liquidated Damages are a reasonable approximation of the damages which the Buyer expects to incur.

**Buyer's Obligations**
Buyer shall in good faith comply with its delivery obligations with respect to any items identified to be supplied "by Customer" in the attached Exhibit A. In order for Seller to have an opportunity to achieve its bonus as set forth above if the Seller is in compliance with the terms of this Purchase Order and the Buyer terminates the Order, the Buyer will be obligated to pay the Seller the portion of the Purchase Price earned, based on last occurred Milestone Date as detailed in Exhibit B, plus costs incurred since such Milestone Date. To the extent the foregoing sentence conflicts with General Terms and Conditions No. 3 (Termination), the foregoing sentence shall control.
The Buyer will supply sufficient evidence that funds are available in the form of a standby letter of credit and a documentary letter of credit based on the payment terms, which are acceptable to Seller.

| | Sales Tax: | 0.00 |
|---|---|---|
| | Total: | 8,166,700.00 |

Mail Invoices to:

United Rock Products
1245 E. Arrow Highway
Irwindale CA 91706

Supplier Signature: _____ 3/18/15

Buyer Signature: _____

THE SUPPLIER SIGNATORY ABOVE HAS THE AUTHORITY AND KNOWLEDGE TO BIND THE SUPPLIER TO THE CONTRACT AND AGREES TO THE TERMS & CONDITIONS. SUPPLIER AGREES TO CONFORM WITH TERMS STATED IN TERMS & CONDITION ATTACHMENT.

*Exhibit A to Maxus Lease Schedule 1425-002*

GENERAL TERMS AND CONDITIONS                                                                 Page 3 of 3

1. **IMPORTANT.** Unless expressly stated otherwise in any national or master agreement between the parties, the Terms and Conditions set forth in this document supersedes and nullifies any other Terms and Conditions found at or listed or linked to Seller's web site, retail agreements, field dispatch agreements, contracts, field time sheets, invoices or documents between the parties. Usual and/or customary business practices do not supersede the Terms and Conditions found in this Purchase Order (other page 1, 2 or 3).

2. **Modification.** No modification of the order shall be effective without Buyer's written consent.

3. **Termination.** Buyer reserves the right to terminate this order at any time prior to Final Delivery.

4. **Delivery.** Time is of the essence in this order and, if delivery of conforming goods or performance of conforming services is not completed by the time(s) specified, Buyer reserves the right, in addition to its other rights and remedies, to cancel this order, to reject non-conforming goods or services.

5. **Compliance.** Seller represents and warrants that the goods shipped, and the goods and/or services covered by this order, comply with all applicable laws and government rules, orders or regulations in effect at the time of quotation, sale, delivery and performance.

6. **Contingencies.** Failure of Buyer to perform hereunder, in whole or in part, occasioned by Act of God or the public enemy, fire, explosion, flood, drought, war, fire, sabotage, accident, embargo, government policy, cessation of operations...

7. **Warranties.** In addition to all warranties and remedies provided under law, Seller shall be fully warranted and agrees that:

8. **Loss In Transit and Environmental Responsibility.** Title and risk of loss to goods shall not pass to Buyer until delivery to Buyer (or its agent) designated by Buyer...

9. **Marking.** Each shipment, each package or shipment clearly shall show the name and address, terms of sale and the purchase order number.

10. **Assignment.** Assignor and/or this order or of any interest therein or of any money due or to become due hereunder without the prior written consent of Buyer shall be void.

11. **Governing Law.** This order shall be governed by the laws of the State of California...

12. **Forum.** The parties hereby agree to submit to the exclusive jurisdiction of state and federal courts in the State of California...

13. **Employees, Insurance, Indemnification.** (a) In performing any services hereunder, Seller is, and shall at all times remain, an independent contractor...

14. **Surety Bonds.** If required on the face of this Purchase Order, Seller agrees to obtain, maintain and furnish to the Contractor an acceptable surety bonds...

15. **Anti-Kickback Policy.** Neither Seller nor any of its subcontractors or employees in furtherance of this order shall pay any commission or fee to agent or any officer or other representative...

16. **Severability.** If any provision of this Agreement as a whole or any part becomes invalid and is objected by a Court to be void and unenforceable, the same shall in no way affect any other provision of this Agreement...

17. **FAR Provisions.** The Federal Acquisition Regulation (FAR) clauses (if any provisions the Prime Contract under which this order is issued) is referenced below...

18. **Compliance and Ethics Program.** Whether or not the Buyer is covered by the FAR, the Buyer/Contractor shall implement a written Code of Business Conduct and Ethics...

Vendor/Contractor Acknowledgement of General Terms & Conditions _____

*Exhibit A to Maxus Lease Schedule 1425-002*



*Exhibit A to Maxus Lease Schdule 1425-002*



**16 YARD CLASS DREDGE**
**SULLY-MILLER CONTRACTING CO. (18-14)**
**SECTION 1.0   EQUIPMENT SPECIFICATIONS AND PRICE**

We would like to provide the following information about the Supreme Manufacturing, Inc. equipment.

*General*

MD class transportable mechanical dredges are designed at Supreme Manufacturing, Inc.'s strict manufacturing practices for dredging and mining service. We have included several other design standards that are detailed within the technical specification found later in this document. The dredge is designed for one man operation from a central control room. From there, an operator friendly interface allows for simple operation of all of the dredging and monitoring functions. The dredge is designed so that the wear parts are easily accessible and are designed for economic replacement. When possible, parts will be from a domestic source for better availability. The pontoons are designed with bolt up connections for assembly.

*DREDGE STANDARD FEATURES:*

| | |
|---|---|
| Model: | 16 to YARD TWIN-MP (WITH DOG-E GANTRY) |
| Bucket capacity: | (2) 16 cubic yard (with extra weight for better penetration) |
| Bucket type: | electro-hydraulic |
| Digging depth: | 520 feet (or customer) |
| Hoist frame type: | gantry |
| Hoist system: | (2) 50 ton hoist with AC motor (or customer) |
| Controls: | Complete electrical package |
| Main screens: | (3) Deister 6'x24' double deck with modular polyurethane screen |
| Feed system: | hopper, grizzly and hydraulic actuated feed gates to main screens |
| Shore anchoring | (4) deck winches (600 feet on each winch, supplied with dredge) |

*Inspection Platforms*

The walkways and platforms will promote proper equipment inspection and reduce maintenance procedures. All walkways and are provided with anti-skid decking features and galvanized handrails. Walkways, platforms and ladders are designed to meet typical MSHA standards, but each local inspector may have their own nuances and it is the responsibility of the customer to make sure that all MSHA requirements are met.

*Dredge Off-Load Conveyor*

(1) 42"x80' dredge off-load conveyor

Our conveyor will discharge onto the floating conveyors provided by the customer.

*Fresh water pump:*

This is a 6" EL. Smidth Krebs vertical fresh water pump with 75 HP motor with a manifold to supply water to the top deck of the primary screen and five valves for washing off the deck.

*Crusher:*

✓ 30"x55" jaw crusher with 150 HP TEFC electric motor and V-belt drive and sheave package (or customer)
✓ Mounting stand & chutes to & from crusher

Your investment for the *SUPREME* dredge:        $8,166,700

*Exhibit A to Maxus Lease Schdule 1425-002*



16 YARD TWIN DREDGE
SULLY-MILLER CONTRACTING CO. (TMS.)
SECTION 1.0   EQUIPMENT SPECIFICATIONS AND PRICE

Prices are delivered and assembled on your site in Irwindale, CA, and also includes 2 weeks on site training by an experienced dredge operator. *Please note* the crane, operator and man lift with 40' of lift are to be provided by the customer. The crane operator and man lift will be needed upon delivery to unload trucks and during the assembly which will take approximately three months.

Price is based on current steel and electrical copper pricing.

SPECIAL TERMS AND CONDITIONS

Please note, the design is designed for and will have the amounts for the fine sand recovery system to be added at the customer expense at a later date.

Page 3 of 15

*Exhibit A to Maxus Lease Schdule 1425-002*



**16 YARD BUCKET DREDGE**
**SULLY-MILLER CONTRACTING CO. (ITT-T4)**
SECTION 2.0  EQUIPMENT SPECIFICATIONS AND PRICE

TECHNICAL DATA

**Bucket**
| | |
|---|---|
| volume | 16 cubic yards each |
| weight | 24 tons each |
| motor HP | 150 HP each |
| average bucket opening | 11 seconds |
| average bucket closing | 19 seconds |
| opening pressure | 4000 psi |
| closing pressure | 4000 psi |

**Trolley Hoist**
| | |
|---|---|
| working load | by customer |
| heat treated drum | by customer |
| digging depth | by customer |
| hoisting (underwater) | by customer |
| hoisting (free air) | by customer |
| lowering | by customer |
| digging positions | two for each bucket |
| trolley traveling | 120 feet/minute |

**Positioning winches (4)**
| | |
|---|---|
| bare drum line pull | 13,000 lbs |
| cable diameter | 3/4 inch galvanized |
| cable storage capacity | 600 feet supplied with dredge |

**Motor outputs**
| | | |
|---|---|---|
| hoisting and lowering | 4 x 490 ???HP | |
| hoist brake | 4 x 3 ?? | HP |
| trolley traveling | 8 x 7-1/2 | HP |
| bucket opening and closing | 2 x 150 | HP |
| grizzly tilt, hopper gate | 1 x 75 | HP (hydraulic) |
| dewatering screen (main) | 2 x 75 | HP |
| conveyors (shuttle to discharge) | 2 x 5.5 | HP |
| anchoring winches | 4 x 40 | HP |
| fresh water pump | 1 x 75 | HP |
| crusher | 1 x 150 | HP |
| dredge off load floating conveyor | 1 x 40 | HP |
| floating conveyors | 4 x 40 | HP |
| water to land conveyor | 1 x 75 | HP |
| spare boxes | 4 x 40 | HP |
| dewatering screen (sand) (optional) | 2 x 20 | HP |
| fine sand pump (optional) | 3 x 75 | HP |
| silt pump (optional) | 1 x 75 | HP |

Electronically Filed 01/20/2016 10:40 / / CV 16 857603 / Confirmation Nbr. 647306 / CLSDH

*Exhibit A to Maxus Lease Schdule 1425-002*

10 YARD BUCKET DREDGE
SCULLY-MILLER CONTRACTING CO. (LTD.)

SECTION 1.0  EQUIPMENT SPECIFICATIONS AND PRICE

SCOPE:

A. PONTOONS

B. GANTRY

C. STAIRS, LANDINGS, CATWALKS, HANDRAILS AND LADDERS

D. HOIST

E. TROLLEY HOUSE

F. TROLLEY TRAVEL DESIGN

G. HYDRAULIC BUCKET AND MOTOR

H. HOPPER AND AUTOMATED FEED GATE

I. GRIZZLY AND OVERSIZE CHUTE

J. DEWATERING SCREEN

K. OPERATOR'S CABIN AND CONTROL ROOM

L. ELECTRICAL CONTROLS AND EQUIPMENT

M. DREDGE AUTOMATION PROGRAM

N. POSITIONING WINCHES

O. DREDGE OUT-LOAD CONVEYOR

P. FINE SAND RECOVERY SYSTEM

Q. FRESH WATER PUMP

R. CRUSHER

S. COATINGS

T. BUILDING STANDARDS

Electronically Filed 01/20/2016 10:40 / / CV 16 857603 / Confirmation Nbr. 647306 / CLSDH

*Exhibit A to Maxus Lease Schedule 1425-002*



16 YARD DREDGE
SULLY-MILLER CONTRACTING CO. (1/4/14)
SECTION 1A EQUIPMENT SPECIFICATIONS AND PRICE

## DREDGE GENERAL DESCRIPTION

### A. PONTOONS

The pontoon configuration provides excellent stability with minimal rocking or tipping, providing better equipment life and increased output. The pontoons are designed single compartment flood-ability. Each chamber is accessible by a manhole. The manhole is sealed with rubber o-ring seals and flush mounted with the deck, providing minimal water leakage. The pontoon sides, top and bottoms are constructed with a minimum 1/4" steel plate. Breathers will be installed in each pontoon compartment to help alleviate the buildup of pressure. Once the dredge is operational and properly ballasted, a line will be painted on the pontoons to provide a visual check for buoyancy.

### B. GANTRY

The gantry is constructed with two deep box girders and bar style end ties. The gantry built to CMAA class F specifications (Extreme duty cycle) USA specifications.  Supreme uses a hardened crane rail (ASCE 105 lbs/ft) with a shock absorbing pad and adjustable hold down clips. This provides for much smoother trolley travel and extended rail life.  Also if and when the rail wears to wear out, the adjustable bolted clips allow for easy rail replacement, as opposed to a weld down steel bar. Polyurethane end bumpers softly secure the trolley at each end of the crane rail, in the event of over-travel.

### C. STAIRS, LANDINGS, CATWALKS, HANDRAILS, AND LADDERS

The dredge is provided with walkways and platforms to promote proper equipment inspection and routine maintenance procedures. All walkways and are provided with anti-skid decking features and galvanized handrails. Walkways, platforms and ladders are designed to meet typical MSHA standards, but each local inspector may have their own nuances and it is the responsibility of the customer to make sure that all MSHA requirements are met.

### D. HOIST CONSTRUCTION

The hoists are provided by the customer and will be needed at the dredge assembly site approximately one month after the dredge assembly is commenced by Supreme. We have observed the two existing customer hoists and these doesn't appear to be any damage that would make them reusable, but we did not verify the structural integrity of the hoist or the gear boxes. Any analysis of this equipment is the responsibility of the customer. Supreme will provide two sets of cables for a 320' digging depth.

### E. TROLLEY HOUSE CONSTRUCTION

The trolley house will be provided by the customer and will be needed at the dredge assembly site approximately one month after the dredge assembly is commenced by Supreme. We suggest the house have a beam in the center of the roof with a small winch for use in changing cables. We also suggest the lights be attached to the side panels, so the roof can be easily removed, if needed.

### F. TROLLEY TRAVEL DESIGN

Supreme will supply new end trucks to bolt up to the customer's existing hoists. Four driven crane style roller bearing trolley wheels provide smooth travel and good acceleration.

### G. HYDRAULIC BUCKET AND MOTOR

The heavy duty bucket comes with weld on shanks and replaceable teeth. The Supreme spade nosed bucket has no internal bracing that can allow material build-up. The extra heavy duty arced lip provides Supreme strength and digging capabilities.

### H. HOPPER AND AUTOMATED FEED GATES

The hopper is constructed from 3/8" plate with gussets and braces and has a holding capacity of approximately two buckets. The feed gates provide even distribution onto one main stream.  The gates can be controlled either automatically with the PLC programming, or over-ridden and controlled manually with a toggle switch. Gates are visible from the operator's cab.

Electronically Filed 01/20/2016 10:40 / / CV 16 857603 / Confirmation Nbr. 647306 / CLSDH

*Exhibit A to Maxus Lease Schdule 1425-002*



IS YARD SAIN DREDGE
SULLY-MILLER CONTRACTING CO. (1LSDH)
SECTION 3:  EQUIPMENT SPECIFICATIONS AND PRICE

### 3.   GRIZZLY AND OVERSIZE CHUTE

The grizzly is constructed from steel plate to form a grid with 6" openings as specified by the customer.  The grid is transversely supported by heavy wall square tube.  The double hydraulic cylinder actuated dump grizzly tilts by pivoting at the edge of the oversize chute on bearing block with bushings and shafts.  The chute is constructed of 3/8" plate and is gusseted with angle iron and plate gusset  The oversize chute includes liner similar to your previous dredge.

### 4.   DEWATERING SCREEN



- ✓ (2) TFG-2024, double deck, 8'x12' Deister Heavy Duty Horizontal Vibrating Screen.
- ✓ Deister screens are made in Fort Wayne, Indiana.  This provides for support and replacement parts domestically available.
- ✓ The design also includes a 30" feed box that over the feed gates and the primary screen.  This box spreads the material over the entire width of the screen much better than feeding the material directly onto the surface of the screen.  If additional water is desired, the box allows water to be sprayed over all the material much more efficiently.
- ✓ The top screen deck is provided with modular polyurethane screens, with approximately 3-1/4" openings.  The second deck is supplied with modular polyurethane screen with Maxi VR long narrow slots for dewatering fine material.

### 5.   OPERATOR'S CABIN AND CONTROL ROOM

The operator's cabin is spacious, with large bay windows providing outward to give the operator excellent visibility.  Control panels are ergonomically located for easy operation of the entire dredge system.  Cab features include air conditioning, heater, insulation, lighting, and an operator's seat.

### 6.   ELECTRICAL CONTROLS AND EQUIPMENT

**The customer will provide 480 volt power to the onboard dredge motor control center** and will be needed at the dredge assembly site approximately two months after the dredge assembly is commenced by Supreme

The system includes a Programmable Logic Control (PLC).  Exclusive automation monitors closing of bucket and gives a bucket refusal tilt only if, and proportionate to the amount that is needed to maximize material volume in bucket.

The controls in operator's cabin include:
- ✓ Toggle switch for bucket and trolley manual control
- ✓ Switch for automatic bucket and trolley control
- ✓ Toggle switch for manual operation or override of feed gates
- ✓ Selector switch for manual or automatic operation of feed gates
- ✓ Toggle switch for operation of tilting grizzly
- ✓ Emergency stop buttons
- ✓ Bucket tonnage meter
- ✓ Bucket depth display
- ✓ Four toggle switch controls for activation of deck winches
- ✓ PLC controller screen for monitoring and adjustment by operator
- ✓ Lighted push-button controls for start and stop of equipment
- ✓ Diagnostic screens show faults or interruptions

The dredge includes a light package for night operation.
Electrical equipment meets NEC code specifications.

### 7.   DREDGE AUTOMATION PROGRAM

Using the powerful PLC controls, the dredge can make minor adjustments automatically, such as locating the bottom, and making the corresponding adjustments.  The PLC can also automatically eliminate most potentially damaging or dangerous situations that could occur from the machine running out of sequence.  For example, if the grizzly is up, the bucket will stop just before the hopper and will wait until the grizzly is lowered and then resume in the automatic mode.

*Exhibit A to Maxus Lease Schedule 1425-002*



16 YARD DREDGE
SULLY-MILLER CONTRACTING CO. (11-1/13)
SECTION 12  EQUIPMENT SPECIFICATIONS AND PRICE

**5.  *COATINGS***

Non-immersion:
- Blast all steel SSPC-SP6.  Blast to achieve 1- to 2- mils profile as determined with a surface profile comparator
- First coat; 3-4 mils (dry film thickness) Oxide red epoxy
- Second coat; 4-6 mils (dry film thickness) Pearl Gray epoxy
- Finish coat; 2  mil's (dry film thickness) polyurethane

Decks:
- Blast all steel SSPC-SP6.  Blast to achieve 1- to 2- mils profile as determined with a surface profile comparator
- First coat; 3-4 mils (dry film thickness) Oxide red epoxy
- Second coat; 4-6 mils (dry film thickness) Pearl Gray epoxy
- Finish coat; 4-6 mils (dry film thickness) Pearl Gray epoxy with non-skid added

Immersion:
- Blast all steel SSPC-SP10.  Blast to achieve 2- to 4- mils profile as determined with a surface profile comparator
- One coat; 16 mils (dry film thickness) Coal Tar epoxy or equivalent

Flotation Tanks Interior:
- The interior of flotation tanks are not coated.

**7.  *BUILDING STANDARDS***

Dredges manufactured by Supreme Manufacturing, Inc. are designed and built using the following regulations as our guidelines:

- Manual of Steel Construction by the American Institute of Steel Construction
- Structural Welding Code – Steel by the American Welding Society and the American National Standards Institute
- Mining Safety and Health Act
- Occupational Safety and Health Act
- Surface Preparation specifications Steel Structures Painting Council
- National Electrical Code Handbook

*Note: Specifications may change due to continual product improvement.*

Electronically Filed 01/20/2016 10:40 / / CV 16 857603 / Confirmation Nbr. 647306 / CLSDH

*Exhibit A to Maxus Lease Schedule 1425-002*



*Exhibit A to Maxus Lease Schedule 1425-002.*

TN YARD    DREDGE

MILESTONES BY CATEGORY

| CATEGORY & DESCRIPTION & PAYMENT SCHEDULE | | 3/30/15 FIRST PAYMENT 10% | 3/30/15 | 5/14/15 | Jun 15 | IPP12 PROGRESS PAYMENT | 1-A15 FINAL PAYMENT | TOTAL |
|---|---|---|---|---|---|---|---|---|
| | | 5,652,700.00 | $10,570.00 | | | | 7.50% | 100.00% |
| | | | | | | 6,162,830.00 | 1,230,000.00 | $ 100,700.00 |
| A | PONTOONS | | 13% | 25% | 40% | 75.00% | 75.00% | 100% |
| B | GANTRY & LEGS | | | | 40% | | | 100% |
| C | STAIRS LANDINGS CATWALKS (HANDRAILS & LADDERS | | 15% | 25% | 40% | | | 100% |
| D | HOIST CABLES     HOISTS | | | 7% | 90% | | | 100% |
| E | TROLLEY HOUSE | | | | 100% | | | 100% |
| F | TROLLEY TRAVEL DESIGN & NEW END TRUCKS | | | 30% | 70% | | | 100% |
| G | HYDRAULIC BUCKET & MOTOR | | 15% | 20% | 25% | 50% | | 100% |
| H | HOPPER & AUTOMATED FEED GATE | | | | 20% | 50% | | 100% |
| I | GRIZZLY & COARSE CHUTE | | | | 30% | 50% | | 100% |
| J | DEWATERING SCREENS | | | 54% | 20% | | | 100% |
| K | SCREEN FRAMES, POSSUM BELLYS, WALKWAYS | | | 37% | 30% | 30% | | 100% |
| L | OPERATORS CABIN & CONTROL ROOM | | 20% | | 30% | 35% | 1% | 100% |
| M | ELECTRICAL CONTROLS & EQUIPMENT | | | 80% | | 30% | | 100% |
| N | POSITIONING WINCHES & CABLES | | | | 60% | 40% | | 100% |
| O | DREDGE OFF-LOAD CONVEYOR | | | 75% | | | | 100% |
| P | FINE SAND RECOVERY SYSTEM | | | | 50% | 50% | | 100% |
| Q | FRESH WATER PUMP, SUMP, MANIFOLD, HOSES, ETC. | | | | | | | 100% |
| R | CRUSH/CON STAND CHUTES & PONTOON REINFORCEMENTS  CRUSHER | | | 20% | | 40% | | 100% |
| S | COATINGS & GALVANIZING | | | 60% | | 50% | | 100% |
| T | BUILDING STANDARDS | | | | | | | 100% |
| U | ASSEMBLY & TRUCKING | | | | | 30% | 70% | 100% |
| V | BARGE/DREDGE UNIT, DUMP CYLINDERS, HOPPER GATES, HOSE., ETS | | | 50% | 50% | | | 100% |
| W | MISC. | | | | | 5% | | 100% |
| | TOTAL | | | | | | | |

02/27/15  P.O. MODIFICATION DATE
6/12/15    START ASSEMBLY
10/10/15  3 MONTHS FOR ASSEMBLY
10/10/15  1 MONTH CUSHION
11/29/2015  FINAL DAY FOR FULL CONUS
2/27/16   DUE DATE (P.O. MODIFICATION DATE - 365 DAYS)

P  P191

*Exhibit A to Maxus Lease Schdule 1425-002*

EXHIBIT B

The Purchase Price earned on each Milestone Date shall be determined in accordance with the following schedule.

| MILESTONE DATES | PURCHASE PRICE EARNED AT EACH MILESTONE DATE |
|---|---|
| February 27, 2015 | $840,704.60 |
| March 30, 2015 | $2,206,735.35 |
| May 14, 2015 | $4,045,670.10 |
| June 29, 2015 | $6,422,471.75 |
| August 12, 2015 | $7,574,011.25 |
| January 14, 2016 | $9,165,780.00 |

Initials of Signatory for Seller _____

Initials of Signatory for Buyer _____